FILED

September 1 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0015

DA 14-0015

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 255

GREGORY A. CHRISTIAN; MICHELLE D.
CHRISTIAN; ROSEMARY CHOQUETTE;
DUANE N. COLWELL; SHIRLEY A. COLWELL;
FRANKLIN J. COONEY; VICKI COONEY;
GEORGE COWARD; SHIRLEY COWARD;
JACK E. DATRES; SHEILA DORSCHER; VIOLA
DUFFY, BRUCE DUXBURY; JOYCE DUXBURY;
BILL FIELD; CHRIS FIELD; ANDREW GRESS
AND FRANK GRESS AS CO-PERSONAL
REPRESENTATIVES OF THE ESTATE OF JAMES
GRESS; CHARLES GUSTAFSON; MICHAEL
HENDRICKSON; PATRICE HOOLAHAN; SHAUN
HOOLAHAN; ED JONES, RUTH JONES; BARBARA
KELSEY; MYRTLE KOEPPLIN; BRENDA
KRATTIGER; DOUG KRATTIGER; JULIE LATRAY;
LEONARD MANN; VALERIE MANN; KRISTY
MCKAY; RUSS MCKAY, BRYCE MEYER; MILDRED
MEYER; JUDY MINNEHAN; TED MINNEHAN;
DIANE MORSE; RICHARD MORSE; KAREN
MULCAHY; PATRICK MULCAHY; NANCY MYERS;
SERGE MYERS; LESLIE NELSON; RON NELSON;
JANE NEWELL; JOHN NEWELL; GEORGE NILAND;
LAURIE NILAND; DAVID OSTROM; ROSE ANN
OSTROM; JUDY PETERS; TAMMY PETERS;
ROBERT PHILLIPS;  TONI PHILLIPS; CAROL
POWERS; WILLIAM D. POWERS; GARY RAASAKKA;
MALISSA RAASAKKA; ALEX REID; KENT
REISENAUER; PETER REISENAUER; SUE REISENAUER;
LARRY RUPP; JOHN A. RUSINSKI; KATHRYN
RUSISKI; EMILY RUSS; SCOTT RUSS; CARL RYAN;
PENNY RYAN; RICH SALLE; DIANE SALLE; DALE
SCHAFER; DAVID D. SCHLOSSER; ILONA M.
SCHLOSSER; MICHAEL SEVALSTAD; JIM SHAFFORD;
ROSEMARIE SILZLY; ANTHONY SOLAN; KEVIN
SORUM; DON SPARKS; VICKIE SPEHAR; ZANE
SPEHAR; CARA SVENDSEN; CARON SVENDSEN;
JAMES H. SVENDSEN, SR.; JAMES SVENDSEN, JR.;
DOUG VIOLETTE; ESTER VIOLETTE; CAROL
WALROD; CHARLES WALROD; DARLENE WILLEY;
KEN YATES; SHARON YATES; LINDA EGGEN AS
PERSONAL REPRESENTATIVE OF THE ESTATE OF
WILLIAM YELSA AND AS GUARDIAN OF MAURINE

YELSA; DAVID ZIMMER; and TONI ZIMMER,

> Plaintiffs and Appellants,

> v.

ATLANTIC RICHFIELD COMPANY,

> Defendant and Appellee.

---

APPEAL FROM: District Court of the Second Judicial District,
In and For the County of Butte/Silver Bow, Cause No. DV-08-173 BN
Honorable Brad Newman, Presiding Judge

COUNSEL OF RECORD:

> For Appellants:

> Mark M. Kovacich (argued), Tom L. Lewis, J. David Slovak, Lewis, Slovak & Kovacich, P.C., Great Falls, Montana

> Monte D. Beck, Justin P. Stalpes, Lindsay C. Beck, Beck & Amsden, PLLC, Bozeman, Montana

> For Appellee:

> John P. Davis, Patrick M. Sullivan, Poore, Roth & Robinson, P.C., Butte, Montana

> Shannon Wells Stevenson (argued), Jonathan W. Rauchway, Mark E. Champoux, James R. Henderson, David Graham & Stubbs LLP, Denver, Colorado

---

Argued: January 14, 2015
Submitted: February 17, 2015
Decided: September 1, 2015

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1      Appellants own properties in and around the town of Opportunity, Montana. Opportunity is a rural community a few miles east of a former copper smelter operated by the Anaconda Company. Appellee Atlantic Richfield Company (ARCO) is the successor in interest to the Anaconda Company. During smelting operations, which took place between 1884 and 1980, the smelter emitted smoke and fumes containing arsenic and other toxic materials. Particles of these materials settled on the surrounding lands. The area is now classified as a Superfund site. Appellants filed this action April 17, 2008, seeking damages for the cost of restoring their properties to their original state. ARCO moved for summary judgment on statute of limitations grounds, arguing that the conduct complained of ceased almost 30 years prior to the filing of the complaint. Appellants responded that the continued presence of contaminants on their property constitutes a continuing tort and falls within an exception to the statute of limitations. The District Court granted summary judgment in favor of ARCO on all claims, finding that Appellants' claims were barred by the statute of limitations. We affirm in part, reverse in part, and remand for further proceedings.

¶2      Appellants present the following issues for review:

1. *Whether application of the continuing tort doctrine requires evidence of the continued migration of contaminants.*

2. *Whether genuine questions of material fact exist regarding the reasonableness of abating the contamination on Appellants' properties.*

3. *Whether the continuing tort doctrine applies to Appellants' claims other than nuisance and trespass.*

3

*4. Whether the facts constituting Appellants' claims were concealed or self-concealing, or whether ARCO took action preventing Appellants from learning those facts.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The Anaconda Company[1] opened its first copper smelter in 1884, twenty-six miles west of the mining town of Butte. At the time of its opening, the Anaconda smelter was the largest in the area, with plans already underway to double its capacity. To house workers for this immense enterprise, the town of Anaconda was founded adjacent to the smelter works. A second smelter was completed in 1888, and the combined facility was capable of processing 6,000 tons of copper ore per day. In 1902, with the existing works already becoming obsolete, a new smelter was constructed with an eventual capacity of more than 8,000 tons per day.

¶4 Smelting copper ore involves the application of heat to break the chemical bonds between the desired copper and minerals in the surrounding rock, including sulfur, iron, and arsenic. Soon after operations began at the new works in 1902, nearby farmers and ranchers began to complain that arsenic released from the smelter was killing their livestock. The Anaconda Company paid for the damaged livestock and took remedial measures at the smelter. Individual smokestacks were replaced by a system of flues designed to let the smoke cool, allowing harmful particles to condense and settle to a fine dust, before being discharged through a single main stack. The height of the main stack

---

[1] The Anaconda Company was known by several different names throughout its corporate history, including the Anaconda Mining Company, the Anaconda Copper Mining Company, and the Anaconda Gold and Silver Company. For simplicity, we will use the name Anaconda Company throughout.

was increased to 300 feet to allow the smoke to be discharged higher in the atmosphere, where any remaining harmful materials would be dissipated over a wider area.

¶5    The farmers' and ranchers' concerns about harm to their crops and livestock from arsenic deposited on their lands were not alleviated by these measures. In 1905, Fred Bliss, representing the Deer Lodge Valley Farmers' Association, filed suit against the Anaconda Company. The United States also filed suit regarding damage to federally-owned property caused by smelter emissions. As a result of negotiations stemming from that suit, a three-member commission was instituted to study the emissions problem and make recommendations for remedial action. Among other improvements, the "Smoke Commission" recommended construction of a new 585-foot main stack to propel emissions even higher into the atmosphere.

¶6    As part of the efforts to settle lawsuits brought by Bliss and others, the Anaconda Company obtained smoke and tailings easements allowing the deposition of smelter waste on the subject properties, including many of those now owned by Appellants. The Anaconda Company also purchased significant amounts of land near the smelter. On this land, the Anaconda Company set out to establish a rural housing community for smelter workers, called Opportunity. The Anaconda Company's aim in founding Opportunity was twofold: to attract stable, loyal, and reliable employees; and to quiet concerns about smelter emissions by showcasing a bucolic community situated directly beneath the plume. The Anaconda Company transferred the land that would become Opportunity to the Deer Lodge Valley Farms Company—run by Anaconda Company officers—with language in the deed reserving to the Anaconda Company an easement allowing the

5

deposition of smelter waste on the land. The easement was then incorporated by reference into the deeds transferred to new Opportunity homeowners.

¶7 In 1977, the Anaconda Company was purchased by ARCO. The smelter ceased operations in 1980. The Anaconda Smelter Superfund Site was established in 1983 under the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). All of Appellants' properties lie within the Superfund site, which covers an area of more than 300 square miles. The Environmental Protection Agency organized several public meetings as remediation plans were developed. The environmental contamination in the area was the subject of extensive newspaper coverage. Children in Anaconda provided urine samples to be tested for arsenic exposure. Soil and groundwater sampling and testing was conducted on many properties in Opportunity, including some of those owned by Appellants, beginning in 2002.

¶8 Appellants filed this action on April 17, 2008, stating causes of action for negligence, public nuisance, private nuisance, trespass, strict liability for the conduct of an abnormally dangerous activity, constructive fraud, unjust enrichment, and wrongful occupation of real property. Appellants sought damages for the full cost of restoring their properties to their original, uncontaminated state. On September 12, 2013, ARCO moved for summary judgment on all claims on the grounds they were barred by the applicable statutes of limitations. ARCO argued that Appellants had known about the possible contamination of their properties for years, if not decades, and thus could have brought suit earlier. ARCO also argued that Appellants' claims should not be considered continuing torts, because the contamination was not reasonably abatable and Appellants

6

had produced no evidence that it continued to migrate. Moreover, ARCO claimed the continuing tort doctrine was applicable only to claims for trespass and nuisance, and could not save Appellants' remaining claims from the statute of limitations.

¶9 In response, Appellants argued that ARCO had previously represented that Opportunity was free of contamination, preventing Appellants from investigating the actual extent of harm to their properties. Appellants further argued that the migration of contaminants is not required to establish a continuing tort, and that remediation plans proposed by their experts demonstrated that the contamination could be reasonably abated. Finally, Appellants argued that the continuing tort doctrine could be applied to their claims of negligence, strict liability, wrongful occupation, and unjust enrichment in addition to their claims of nuisance and trespass.

¶10 ARCO also moved for summary judgment on Appellants' negligence claim, on the grounds that Appellants had failed to disclose expert witness testimony defining the applicable standard of care; on Appellants' claim for restoration damages, on the grounds that Appellants' proposed remediation of the site was barred by CERCLA; on all claims concerning Appellants' properties subject to smoke and tailings easements; on Appellants' unjust enrichment, constructive fraud, strict liability, and wrongful occupation claims, on grounds specific to each; and on Appellants' claims for trespass and nuisance, on the grounds that Appellants suffered no actual property damage as a result of the contamination. The District Court heard arguments on the pending summary judgment motions on November 18 and 20, 2013.

¶11 On December 17, 2013, the District Court granted summary judgment in favor of ARCO on all claims, finding they were barred by the applicable statutes of limitations. The District Court concluded that due to widespread awareness about contamination from the smelter and the availability of environmental testing, Appellants should have known the facts constituting their claims earlier. The District Court also concluded that application of the continuing tort doctrine requires evidence of continued migration of contaminants, which the District Court found Appellants had failed to produce. The District Court also concluded that Appellants had not identified facts showing that their proposed abatement was reasonable, further precluding application of the continuing tort doctrine. Finding the statute of limitations issue dispositive with respect to all claims, the District Court did not address the remaining motions for summary judgment. The District Court ordered dismissal of the entire action, and this appeal followed.

## STANDARD OF REVIEW

¶12 We review a district court's grant of summary judgment de novo, applying the same M. R. Civ. P. 56(c) criteria as the district court. *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 36, 345 Mont. 12, 192 P.3d 186. Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c); *Estate of Willson v. Addison*, 2011 MT 179, ¶ 13, 361 Mont. 269, 258 P.3d 410. Summary judgment is an extreme remedy that should never be substituted for a trial if a material factual controversy exists. *Hajenga v. Schwein*, 2007 MT 80, ¶ 11, 336 Mont. 507, 155 P.3d 1241 (quoting *Lee v. USAA Cas. Ins. Co.*, 2001 MT 59, ¶ 71, 304 Mont. 356, 22 P.3d 631). The moving party must

8

"'exclude any real doubt as to the existence of any genuine issue of material fact' by making a 'clear showing as to what the truth is.'" *Lorang*, ¶ 37 (quoting *Toombs v. Getter Trucking, Inc.*, 256 Mont. 282, 284, 846 P.2d 265, 266 (1993)). If there is any doubt as to whether a genuine issue of material fact exists, that doubt must be resolved in favor of the party opposing summary judgment. *Lorang*, ¶ 38.

**DISCUSSION**

¶13 Statutes of limitations promote basic fairness. *Burley v. BNSF Ry. Co.*, 2012 MT 28, ¶ 16, 364 Mont. 77, 273 P.3d 825. They suppress stale claims, *Burley*, ¶ 16, ensuring that the responding party has a reasonable opportunity to mount an effective defense, *Mont. Pole & Treating Plant v. I.F. Laucks & Co.*, 993 F.2d 676, 678 (9th Cir. 1993). Statutes of limitations compel the exercise of a right of action within a reasonable time, because excessive delay "is clearly not conducive to a full presentation of the evidence nor a search for the truth." *E.W. v. D.C.H.*, 231 Mont. 481, 484, 754 P.2d 817, 819 (1988), *superseded by statute*, § 27-2-216, MCA, *as recognized in Cosgriffe v. Cosgriffe*, 262 Mont. 175, 177-78, 864 P.2d 776, 777-78 (1993). Generally, a claim accrues and the limitations period begins to run when all elements of the claim or cause of action exist, including damages. Section 27-2-102, MCA; *Uhler v. Doak*, 268 Mont. 191, 196, 885 P.2d 1297, 1300 (1994). At times, however, principles of fairness require us to recognize exceptions to this rule. *Mont. Pole*, 993 F.2d at 678. Appellants argue that two such exceptions apply to their claims: the continuing tort doctrine and the discovery rule.

¶14 Before addressing these exceptions, we note the following statutes of limitations applicable to Appellants' claims: For an action based on fraud, including constructive

9

fraud, two years, § 27-2-203, MCA; *Deschamps v. Treasure State Trailer Court, Ltd.*, 2010 MT 74, ¶ 33, 356 Mont. 1, 230 P.3d 800; for injury to property, including nuisance and trespass, two years, § 27-2-207, MCA; for unjust enrichment, three years, § 27-2-202, MCA; *N. Cheyenne Tribe v. Roman Catholic Church*, 2013 MT 24, ¶ 41, 368 Mont. 330, 296 P.3d 450; and for general tort actions, including negligence and strict liability, three years, § 27-2-204, MCA.[2] Appellants' complaint was filed April 17, 2008. Absent an exception to the applicable limitations periods, and applying the longer three-year period for purposes of this analysis, Appellants' claims are time-barred if they accrued earlier than April 17, 2005.

¶15     *1. Whether application of the continuing tort doctrine requires evidence of the continued migration of contaminants.*

¶16     A nuisance is defined, in relevant part, as "[a]nything that is injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . ." Section 27-30-101(1), MCA; *Graveley Ranch v. Scherping*, 240 Mont. 20, 22-23, 782 P.2d 371, 373 (1989). A trespass is an intrusion on a party's right to exclusive possession of his or her property. *Burley*, ¶ 13 (citing *Tally Bissell Neighbors, Inc. v. Eyrie Shotgun Ranch, LLC*, 2010 MT 63, ¶ 38, 355 Mont. 387, 228 P.3d 1134). Injuries to property, including nuisance and

---

[2] The statute of limitations for a claim of wrongful occupation will be discussed later in this Opinion.

10

trespass, have a limitations period of two years. Section 27-2-207, MCA; *Burley*, ¶ 16. Both nuisance and trespass, however, may constitute continuing torts.[3] *Burley*, ¶ 14.

¶17 A continuing tort is one that is "not capable of being captured by a definition of time and place of injury because it is an active, progressive and continuing occurrence. It is taking place at all times." *Floyd v. City of Butte*, 147 Mont. 305, 312, 412 P.2d 823, 826 (1966). The continuing tort exception may be applied to injuries that are ongoing or in some way recurring. *Burley*, ¶ 14 (continuing tort doctrine "applies to a temporary injury that gives rise to a new cause of action each time that it repeats."). For example, in *Graveley Ranch*, batteries left on the defendants' property discharged lead onto the neighboring ranch, poisoning several of their cattle. *Graveley Ranch*, 240 Mont. at 21, 782 P.2d at 372. The leaching of lead from the batteries onto plaintiffs' property was a condition that would continue until the batteries were removed, while the death of cattle from exposure to lead was an injury that periodically recurred. We held that the nuisance was "continuing until it is abated; the statute does not begin to run until the batteries are removed and the toxic residue cleaned . . . ." *Graveley Ranch*, 240 Mont. at 25, 782 P.2d at 375. Further, if the nuisance was not abated, we noted that "a new cause of action may arise each time a cow becomes ill or dies as a result of lead poisoning." *Graveley Ranch*, 240 Mont. at 25, 782 P.2d at 375.

---

[3] Appellants also claim the continuing tort doctrine should apply to their claims of negligence, strict liability, wrongful occupation, and unjust enrichment. In this section, we address only their claims of continuing nuisance and trespass. Remaining claims will be discussed separately.

¶18    Although we refer here to the "continuing tort doctrine," the simple fact that the condition constituting a nuisance or trespass continues to exist does not itself suffice to toll the statute of limitations.[4]   The continuing tort doctrine requires us to consider whether a nuisance or trespass is temporary or permanent in character.   A permanent nuisance or trespass is "one where the situation has 'stabilized' and the permanent damage is 'reasonably certain.'"  *Haugen Trust v. Warner*, 204 Mont. 508, 513, 665 P.2d 1132, 1135 (1983) (quoting *Blasdel v. Mont. Power Co.*, 196 Mont. 417, 640 P.2d 889 (1982)).  If a nuisance or trespass is permanent, the limitations period begins to run "from the completion of the structure or thing which constitutes or causes the nuisance," and all damages caused by the nuisance or trespass must be recovered in a single action. *Graveley Ranch*, 240 Mont. at 23, 782 P.2d at 373.   When damages for a permanent nuisance or trespass are assessed once and for all, then the plaintiff will be permitted to recover both past and prospective damages.  The continuing tort doctrine does not toll the statute of limitations in cases of a permanent nuisance or trespass.

¶19    When we refer to a continuing nuisance or trespass for purposes of the continuing tort doctrine, we are actually referring to a temporary nuisance or trespass.  The terms "continuing" and "temporary" are often used synonymously or interchangeably by courts. *See, e.g.*, *Hoery v. United States*, 64 P.3d 214, 217-18 (Colo. 2003).  If a nuisance "is terminable, it cannot be deemed a permanent nuisance," and is therefore considered temporary. *Haugen Trust*, 204 Mont. at 514, 665 P.2d at 1135.  If a nuisance or trespass

---

[4]  "Tolling" means to stop or interrupt the running of the limitations period.  *Black's Law Dictionary* 1716 (Bryan A. Garner ed., 10th ed. 2014).

12

is temporary, its repetition or continuance "gives rise to a new cause of action, and recovery may be had for damages accruing within the statutory period next preceding the commencement of the action . . . ." *Graveley Ranch*, 240 Mont. at 23, 782 P.2d at 373 (quoting *Walton v. City of Bozeman*, 179 Mont. 351, 356, 588 P.2d 518, 521 (1978)). Thus, the injured party may maintain successive actions for damages incurred during the statutory period prior to the filing of each complaint. *Shors v. Branch*, 221 Mont. 390, 397, 720 P.2d 239, 243 (1986); *see also Mangini v. Aerojet-General Corp.*, 912 P.2d 1220, 1230 (Cal. 1996). Prospective damages are unavailable when the injury is continuous and recovery is limited to actual injury suffered prior to commencement of each action.

¶20 These distinctions could create particular problems for the parties. For example, if the defendant is willing and able to abate the nuisance it may be unfair to award prospective damages on the presumption that the nuisance will continue. On the other hand, if it appears improbable that the nuisance can or will be abated, or if the plaintiff is willing that the nuisance continue provided compensation is paid for past and future injuries, then it may be unreasonable to leave the plaintiff to the troublesome remedy of successive actions. Thus, when distinguishing between permanent and continuing nuisances, each case must be determined upon its own peculiar circumstances by applying the considerations of abatability. As determined in *Burley*, fundamental considerations underlying abatability include the cost of abatement, the type of property affected, the severity of contamination, and the length of time necessary to remediate the contamination. *Burley*, ¶ 89. By maintaining a focus on whether the injury can be

13

discontinued or abated, we remain true to these basic principles of recovery for damages due to successive injuries. Necessarily, this will require consideration of whether the contamination has stabilized or continues to migrate.

¶21    In *Burley*, we addressed a certified question from the United States District Court for the District of Montana asking how the continuing tort doctrine would apply to "property damage claims of nuisance and/or trespass resulting from contamination which has stabilized, continues to migrate, and is not readily or easily abatable." *Burley*, ¶¶ 1-2. In *Burley*, as here, operations at a former industrial site—in that case, a rail yard— resulted in the discharge of toxic pollutants which contaminated the soil of neighboring properties. *Burley*, ¶ 5. Like the Anaconda smelter, the rail yard closed in the 1980s, and thus no further contaminants were being generated or discharged by the time the neighboring landowners brought suit in 2007. *Burley*, ¶¶ 5, 8. In this case, as in *Burley*, there appears to be no dispute that "the overall concentration of pollutants in the underground plume no longer [is] increasing." *Burley*, ¶ 20. We held that "[c]ontamination that has stabilized in terms of quantity or concentration, but continues to migrate will toll the statute of limitations until the harm no longer reasonably can be abated." *Burley*, ¶ 4. As requested in the certified question, we addressed the elements of stabilization, migration, and abatability, but nevertheless maintained a focus on reasonable abatability as the dispositive factor in determining whether a tort is permanent or temporary. "The fact that the nuisance at issue could be abated in some fashion permeates this Court's historical nuisance cases." *Burley*, ¶ 74. Here, we will likewise

address stabilization and migration, but will not deviate from the central principle, stated in *Burley*, that reasonable abatability defines whether a tort is permanent or temporary.

¶22 Courts have employed different analytical approaches when addressing the role of migration in application of the continuing tort doctrine. The approaches vary depending on whether the focus of inquiry is on the conduct of the tortfeasor or the nature of the injury suffered by the property owner. One approach holds that the statute of limitations begins to run at the time the defendant stops engaging in the offensive activity and is no longer adding to the contamination, even if the contamination remains present and continues to migrate. *Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th Cir. 2004). Another holds that a trespass or nuisance continues after the defendant has stopped engaging in the offensive activity only if the contamination continues to migrate, seeping onto the plaintiffs' properties within the limitations period preceding the complaint. *Taygeta Corp. v. Varian Assocs.*, 763 N.E.2d 1053, 1064-65 (Mass. 2002). Yet another group of cases has found that migration was present and would establish a continuing tort, but did not conclusively analyze whether a continuing tort could be established in the absence of either migration or continuing activity. *Arcade Water District v. United States*, 940 F.2d 1265, 1268 (9th Cir. 1991); *Starrh & Starrh Cotton Growers v. Aera Evergy, LLC*, 153 Cal. App. 4th 583, 584 (2007). Although these cases addressed migration and continuing activity, they held that reasonable abatability was ultimately the defining characteristic of a continuing tort. *Arcade*, 940 F.2d at 1268; *Starrh*, 153 Cal. App. 4th at 596. The final approach holds that a trespass or nuisance continues for as long as the contamination remains on the plaintiff's property and can be

15

abated, even if the contamination is stable and non-migrating. *Hoery*, 64 P.3d at 215; *Bradley v. American Smelting & Refining Co.*, 709 P.2d 782 (Wash. 1985).

¶23 In *Burley*, we recognized that our jurisprudence differentiated between a permanent and a temporary nuisance based upon the nature of the injury suffered, noting that the Court in *Graveley* described a nuisance as permanent where "its construction and continuance necessarily result in an injury" and that a nuisance was temporary when the "injury is not complete" and "the injury depends upon its continuance and uncertain operation of the seasons or of the forces set in motion by it." *Burley*, ¶ 15; *Graveley*, 240 Mont. at 23; 58 Am. Jur. 2d *Nuisances* § 296 (2015). A permanent injury is one where the permanent damage is "reasonably certain." *Blasdel*, 196 Mont. at 426. In contrast, where "damage is not yet permanent," the nuisance is of a "temporary and continuance character and gives rise to a separate cause of action each time it causes damage." *Haugen*, 204 Mont. at 514, 665 P.2d at 1135; 39 Am. Jur. 2d, *Nuisance*, § 141, p. 403; *Nelson*, 154 Mont. at 434, 465 P.2d at 324-25. We rejected the reasoning that the defendant's cessation of the contaminating activity should trigger the limitations period, and held that "[a] defendant's *failure* to stop the continuing migration of a nuisance onto a plaintiff's property, where it reasonably can be stopped, constitutes a continuing property invasion." *Burley*, ¶ 73 (emphasis in original). We recognized that "[a]ll of the nuisances at issues in these cases would remain, or in other words, be permanent, without some outside action to abate." *Burley*, ¶ 41. In adopting the injury-based approach to classification of a trespass or nuisance, we focused on the nature of the injury to the land:

if the trespass causes a "permanent" injury to the land, then the trespass is not continuing; if, however, the injury is "abatable," then the trespass is a continuing one.[5]

¶24    Based on the formulation of the certified question from the U.S. District Court, we assumed that contamination from the rail yard continued to migrate onto the plaintiffs' properties. *Burley*, ¶ 12. Therefore, we placed *Arcade*, 940 F.2d at 1265, *Starrh*, 153 Cal. App. 4th at 583, *Hoery*, 64 P.3d at 214, and *Bradley v. American Smelting & Refining Co.*, 709 P.2d 782 (Wash. 1985), within a group of cases that "consider[] migrating property contamination to constitute a continuing temporary tort," *Burley*, ¶ 68, without addressing the finer distinction between migrating and non-migrating property contamination. While *Burley* made clear that migrating contamination would constitute a continuing tort if reasonably abatable, it did not specifically address whether non-migrating contamination would do so.

¶25    ARCO argues that this Court should adopt the rule, expressed in *Taygeta*, that a continuing trespass or nuisance depends on the continuing migration of contamination. In *Taygeta*, 763 N.E.2d at 1056, an electronics manufacturer discharged industrial chemicals onto the ground and into a stream running through its property. The manufacturer also used an underground storage tank that was discovered to have leaked chemicals into the surrounding soil. A treatment system was installed, but contaminated groundwater continued to flow onto neighboring properties. The Massachusetts Supreme

---

[5]  The insistence by the dissent that migration is required to satisfy the "recurring prong" of the continuous tort doctrine focuses on what the contamination is doing rather than the nature of the injury and whether it is reasonably abatable, as required by *Burley*.

17

Judicial Court concluded that the mere continued presence of contamination would not establish a continuing tort, because "'a continuing trespass or nuisance must be based on recurring tortious or unlawful conduct and is not established by the continuation of harm caused by previous but terminated tortious or unlawful conduct.'" *Taygeta*, 763 N.E.2d at 1065 (quoting *Carpenter v. Texaco, Inc.*, 646 N.E.2d 398, 399 (Mass. 1995)). A claim based on continuing seepage or migration, however, presented a different circumstance because it involved a series of continuing encroachments on the plaintiff's property. *Taygeta*, 763 N.E.2d at 1065. The court permitted a continuing nuisance claim "based on the continuing seepage of pollutants that is still occurring within the statute of limitations." In *Taygeta*, however, the court imposed no requirement on the property owner to timely pursue a claim. The court found a continuing nuisance because the contamination continued to migrate even though the nuisance was not reasonably abatable and damages were ascertainable. Under *Burley*, a reasonably abatable nuisance with ascertainable damages must be considered permanent and thus commencing the limitations period for the filing of a claim.[6]

¶26    Appellants argue that we should instead adopt the approach stated in *Hoery* and *Bradley*, which hold that a trespass or nuisance continues for as long as the offending substance remains on the property and can be abated. In *Hoery*, 64 P.3d at 216, the

---

[6]    *Taygeta* essentially stands for the proposition, suggested by the Concurrence, that migration and stabilization be considered "independent factors," Concurrence, ¶ 87, regardless of whether the contamination may be abated. This is inconsistent with our decision in *Burley* defining a permanent nuisance as one that is not reasonably abatable. In *Burley*, the contamination was migrating, but we instructed the federal court that a jury must nevertheless assess whether it is reasonably abatable.

United States disposed of toxic chemicals, including trichloroethylene (TCE), which created underground plumes of toxic pollution extending for several miles beyond the military base where the chemicals were used. The plume continued to migrate even after operations involving the toxic chemicals were stopped. The plaintiff's irrigation well was contaminated, and the Supreme Court of Colorado noted that "TCE remains on Hoery's property and enters his groundwater and soil on a daily basis, unabated by the United States." *Hoery*, 64 P.3d at 216. The court observed that "[f]or continuing intrusions—either by way of trespass or nuisance—each repetition or continuance amounts to another wrong, giving rise to a new cause of action." *Hoery*, 64 P.3d at 218 (citing Fowler V. Harper et al., *The Law of Torts* § 1.7 (3d ed. 1996)). Reasoning that "the defendant's invasion continues if he fails to stop the invasion and remove the harmful condition," the court held that the ongoing presence and the continuing migration of contaminants each constituted a separate continuing tort. *Hoery*, 64 P.3d at 218, 222.

¶27    In *Bradley*, 709 P.2d at 791, the Supreme Court of Washington held that a "trespass continues until the intruding substance is removed" in the context of an operational copper smelter that continued to generate particulate emissions, which continued to be deposited on the plaintiff's property. Relying on the Restatement definition of a continuing trespass as "an unprivileged remaining on land in another's possession," the court did not consider continued activity or migration to be significant factors, and did not engage in further analysis. *Bradley*, 709 P.2d at 791 (citing Restatement (Second) of Torts § 158 cmt. m (1965)).

19

¶28    We concluded in *Burley*, ¶ 73, that "[t]he fact that a nuisance continues to migrate constitutes an important factor under Montana law in evaluating whether the pollution should be treated as a continuing trespass or nuisance."  Although we considered migration an important factor, we in no way stated that it was a dispositive one. Reviewing our case law, we observed again and again the overriding importance of the question of abatability.  In *Shors v. Branch*, 221 Mont. 390, 720 P.2d 239 (1986), a locked gate prevented plaintiffs' use of their easement rights.  We found a continuing tort on the basis that the condition was easily abated by removing the gate.  *Shors*, 221 Mont. at 397, 720 P.2d at 244.  In *Burley*, ¶ 70, we observed that the tort was continuing in *Shors* despite the fact that it "involved a permanent structure that did not move."  In *Knight v. City of Missoula*, 252 Mont. at 245, 827 P.2d at 1278, a newly constructed dirt road increased noise, traffic, and dust on plaintiffs' property.  The dust increased seasonally, but we observed in *Burley*, ¶ 70, that "[t]his fact played little role in the Court's determination that the nuisance was of a continuing and temporary nature." Instead, we found that the nuisance created by the dirt road was continuing because the city could abate it by such means as paving the road.  *Burley*, ¶ 70; *Knight*, 252 Mont. at 245, 827 P.2d at 1278.

¶29    *Shors* and *Knight* did not involve migration.  We went on to discuss several cases that did involve periodic flooding, rising water, and migrating contamination.  *Burley*, ¶ 71.  We noted that with only one exception, "the Court classified each nuisance as continuing and temporary until abated [and] further noted in each instance that the nuisance could be abated through some sort of 'curative action.'"  *Burley*, ¶ 71.  In

20

*Graveley Ranch*, 240 Mont. at 25, 782 P.2d at 375, although lead continued to leach from the discarded batteries, we did not rely on the fact of migration when we held that the nuisance would continue until it was abated. In *Haugen Trust*, 204 Mont. at 510, 665 P.2d at 1133, ornamental ponds constructed in a subdivision caused periodic flooding in the basement of a residence. The homeowners were able to abate the flooding by installing a culvert cap, but their neighbors later removed the cap, at which time the flooding resumed. *Haugen Trust*, 204 Mont. at 511, 665 P.2d at 1133-34. We observed that the nuisance created by the removal of the cap was temporary both because the damage caused by the flooding varied "from occurrence to occurrence" and because the nuisance was abatable. *Haugen Trust*, 204 Mont. at 513-14, 665 P.2d at 1135. In *Walton v. City of Bozeman*, 179 Mont. 351, 588 P.2d 518 (1978), the city constructed a storm sewer and relocated an irrigation ditch, causing flooding on the plaintiff's land. We held that "the damages caused here were a continuing nuisance and as such were within the applicable statute of limitations, because at all times, the City could have abated the nuisance by taking curative action. Since the nuisance was so terminable, it cannot be deemed to be a permanent nuisance . . . ." *Walton*, 179 Mont. at 356, 588 P.2d at 521. In *Nelson v. C & C Plywood Corp.*, 154 Mont. 414, 465 P.2d 314 (1970), a plywood manufacturer discharged glue waste into a drainage ditch, which contaminated the water supply of the adjacent farm. We held that the nuisance was temporary because it was terminable. *Nelson*, 154 Mont. at 435, 465 P.2d at 325 (quoting *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 53 S. Ct. 602 (1932)).

21

¶30    The only case in which we have found a continuing property invasion without reference to its abatability is *Blasdel*.  In that case, plaintiffs' farm was damaged when construction of the Kerr Dam on Flathead Lake caused the water table to rise.  *Blasdel*, 196 Mont. at 419, 640 P.2d at 891.  The dam was completed in 1939, and plaintiffs first noticed damage to their land in 1941.  *Blasdel*, 196 Mont. at 420, 640 P.2d at 892.  For a number of years after, however, the water table continued to fluctuate.  *Blasdel*, 196 at 422, 640 P.2d at 892.  The water table did not stabilize until 1960, at which time plaintiffs filed suit.  *Blasdel*, 196 at 422, 640 P.2d at 892.  We concluded that the injury was temporary until the water table stabilized, at which point it became permanent.  *Blasdel*, 196 Mont. at 426, 640 P.2d at 894.  Abatement of the injury was never addressed in *Blasdel*, an inverse condemnation case, because "inverse condemnation by its very nature contemplates a permanent taking of property."  *Burley*, ¶ 24.  More importantly, however, our inquiry in *Blasdel* concerned the nature of the injury to the property owners, recognizing that the "source of the entire claim" was the "overflow due to rises in the level of the river," which we identified as a continuing event.  *Blasdel*, 196 Mont at 425, 640 P.2d at 894.  While the dam itself was permanent, the relevant issue for statute of limitations purposes was determining when the rising groundwater had stabilized sufficiently to assess the permanent injury for purposes of the condemnation proceedings.  *Blasdel*, 196 Mont. at 425-26, 640 P.2d at 894.  "It made little sense to require Blasdels to file an inverse condemnation action until they could determine the extent of the taking of their property worked by the rising groundwater tables caused by the Kerr Dam."  *Burley*,

¶ 24. *Blasdel* did not present a claim of nuisance or trespass. *Blasdel*, *196* Mont. at 419, 640 P.2d at 891.

¶31 Our continuing nuisance and trespass cases have consistently considered reasonable abatement to be a determinative factor. *Burley*, ¶ 71. Our consideration of migration, on the other hand, has been inconsistent. *Compare Shors*, 221 Mont. at 397, 720 P.2d at 243, *and Knight*, 252 Mont. at 245, 827 P.2d at 1278, *with Haugen Trust*, 204 Mont. at 513-14, 665 P.2d at 1135. Nevertheless, even in those cases where migration was present, we maintained our focus on the question of whether the injury could be abated. *E.g.*, *Graveley Ranch*, 240 Mont. at 25, 782 P.2d at 375; *see also Arcade*, 940 F.2d at 1268; *Starrh*, 153 Cal. App. 4th at 596. In *Burley*, ¶ 51, we also rejected the notion that stabilization of the contamination should provide a bright-line rule on whether to classify a nuisance or trespass as continuing. While "stabilization" in *Burley* referred to the fact that the tortfeasor was no longer adding to the nuisance or trespass, our discussion of stabilization relied on the same cases as our discussion of migration, and our analysis overlapped in many respects. *See Burley*, ¶ 41 (discussing stabilization of migrating waters in *Blasdel* and *Haugen Trust*). Just as "[a]lleged 'stabilization' of the nuisance, on its own, rarely determines permanency of the injury," *Burley*, ¶ 41, neither will migration, on its own, determine permanency of the injury. Again, "[w]e discern one consistent theme in reviewing the historic decisions of this Court that evaluate whether a nuisance should be classified as temporary or permanent: whether the injury is sufficiently complete to ascertain permanent damages." *Burley*, ¶ 41.

23

¶32 Finally, our decision in *Burley* to focus on the nature of the injury and whether it is reasonably abatable is consistent with the principle that statutes of limitations ought to promote basic fairness and allow the parties a degree of certainty and predictability by which their actions may be guided. *Burley*, ¶ 16. If we were to regard continued migration as determinative of the limitations period, liability for contamination would not depend on the actions of the tortfeasor or the diligence of the property owner. Rather, continued liability would be determined by factors not within the control of the parties, such as soil characteristics or the flow of groundwater. We decline to leave the operation of the law to chance. While migration remains an "important factor," *Burley*, ¶ 73, it is not determinative or required. It is instead among the factors, such as the type of property affected and the severity of the contamination, to be considered when determining the nature of the injury and whether a trespass or nuisance can reasonably be abated. *See Burley*, ¶ 89.

¶33 Although we have considered other factors, such as migration, in defining a continuing trespass or nuisance, we have consistently evaluated those factors in light of the reasonable abatability of the condition. In *Burley*, ¶ 73, while concluding that migration "constitutes an important factor," we observed that "[a] defendant's *failure* to stop the continuing migration of a nuisance onto a plaintiff's property, where it reasonably can be stopped, constitutes a continuing property invasion." Further, in our discussion of abatability, we did not question whether a nuisance or trespass must be abatable to be regarded as continuing. *See Burley*, ¶¶ 74-98. Indeed, the requirement of abatability permeated every aspect of our analysis. *See Burley*, ¶¶ 24-41, 51, 60, 70-71,

24

73. Our discussion of abatability was focused only on the standard by which abatability should be measured. *Burley*, ¶ 89. We recognized that establishing reasonable abatability as the defining characteristic of a continuing tort would "further accomplish[] the companion goal of bringing finality to a dispute for purposes of the statute of limitations." *Burley*, ¶ 88. If the condition can be abated, the reasonable abatability standard encourages the tortfeasor to perform the abatement in order to avoid successive actions. When the condition cannot be abated, the injured party may instead recover all of their damages in a single action, promoting finality. *Starrh*, 153 Cal. App. 4th at 598. Thus, we reaffirm the conclusion reached in *Burley*, ¶ 98: "When no further abatement is reasonable, the injury is complete, and the injury is permanent."

¶34   *2. Whether genuine questions of material fact exist regarding the reasonableness of abating the contamination on Appellants' properties.*

¶35   We turn now to the third factor identified in *Burley*: reasonable abatability. We observed that consideration of the ease with which a nuisance could be abated "permeates this Court's historical nuisance cases." *Burley*, ¶ 74.[7] We rejected the arguments that a nuisance or trespass that is not "readily or easily abatable" must be classified as permanent. *Burley*, ¶ 82. Recognizing that we had previously declined to cap restoration damages at the market value of the property, we noted that limiting the continuing tort doctrine to readily or easily abatable conditions would similarly provide potential tortfeasors with "'an incentive to disregard or discount risks of contamination or

---

[7]   While the language in *Burley* primarily addressed nuisance, we stated that "references to nuisance in this Opinion apply with equal force to trespass claims as well." *Burley*, ¶ 14.

pollution to neighboring property owners.'" *Burley*, ¶ 87 (quoting *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 46, 338 Mont. 259, 165 P.3d 1079). Instead, we adopted the rule that a nuisance or trespass may be continuing if it is "reasonably abatable." *Burley*, ¶ 89. We described the reasonable abatability standard as follows:

> Courts should evaluate whether it would be reasonable for the tortfeasor to abate the harm taking into account all factors, including the ease with which the harm could be abated. Other factors include the cost of abatement, the type of property affected, the severity of contamination, and the length of time necessary to remediate such pollution.

*Burley*, ¶ 89. We now add that whether the contamination continues to migrate is relevant to the ease of abatement, the cost of abatement, the severity of the contamination, and the length of time necessary for abatement, and are therefore among the factors to be considered when determining whether a nuisance or trespass is reasonably abatable. Further, potential abatement must "be an actual possibility within reasonable capabilities of the parties." *Burley*, ¶ 90 (quoting *Burk Ranches v. State*, 242 Mont. 300, 306-07, 790 P.2d 443, 447 (1990)).

¶36 We then stated that the "reasonableness question must be decided by the trier of fact." *Burley*, ¶ 91. Our discussion in *Burley* regarding the necessity of making factual determinations prior to a ruling on the statute of limitations bears repeating here:

> We recognize the potential inconvenience to a district court of having the jury resolve factual disputes that implicate a potentially dispositive statute of limitations affirmative defense. A district court may be required to hold in abeyance any ruling on the statute of limitations affirmative defense until the jury first determines whether the nuisance reasonably can be abated and thereby the nuisance qualifies as a continuing tort. The court would address whether the limitations period had run only if the plaintiff fails to establish the elements of a continuing tort, as determined by the jury . . . .

26

*Burley*, ¶ 92. We later noted that although reasonable abatability is a jury question, "[t]he district court retains the ability to grant summary judgment where the plaintiff fails to establish a genuine issue of fact." *Burley*, ¶ 95. We acknowledged that this threshold would likely be cleared in most cases, but pointed to *Mangini v. Aerojet-General Corp.*, 912 P.2d 1220, 1226 (Cal. 1996) ("*Mangini II*"), as an example of a case in which the plaintiff failed to establish sufficient evidence of the reasonability of a proposed abatement. In *Mangini II*, "the evidence clearly showed that no one knows how bad the contamination is or how to remedy it—indicating an absence of substantial evidence of abatability." 912 P.2d at 1226. The plaintiffs conceded there was not enough known about the site to assess possible remedial measures, and the California Supreme Court concluded they "did not come anywhere close to showing even an estimate of the cost of abatement." *Mangini II*, 912 P.2d at 1226-27.

¶37 Finally, we rejected the argument that the plaintiff must demonstrate the possibility of complete abatement. *Burley*, ¶ 96. We held instead that a nuisance is abatable if it can be reduced. *Burley*, ¶ 97 (citing *Beatty v. Washington Metropolitan Area Transit Authority (WMATA)*, 860 F.2d 1117, 1124 (D.C. Cir. 1988)). We reasoned:

> A tortfeasor should not avoid liability for his contamination simply because his misdeeds cannot be undone completely. The degree of abatement determines instead whether permanent damages can be ascertained. When no further abatement is reasonable, the injury is complete, and the injury is permanent.

*Burley*, ¶ 98.

¶38 The remediation plan proposed by Appellants' expert, Kane, requires excavating the top two feet of soil from Appellants' properties—approximately 650,000 tons, to be

disposed of at a waste management facility in Spokane, Washington—and replacing it with clean fill. Kane's proposed remediation of shallow groundwater involves installation of an underground passive reactive barrier (PRB) approximately 8,000 feet long. Estimates of the cost of the proposed abatement range from $38 million to $101 million, depending largely on where the contaminated soil is disposed, and the project would take nearly two years.

¶39 The rebuttal report prepared by David Folkes, a geotechnical and environmental consultant, one of ARCO's retained experts, argues that remediation could be limited only to those properties where arsenic concentrations in the soil exceed the EPA-approved residential threshold of 250 ppm. Folkes also states that ARCO has already offered to remediate those portions of Appellants' residential properties exceeding 250 ppm, and that the cost of the remediation is estimated at $82,500. Pasture land exceeding 250 ppm could be remediated at an estimated cost of $1,026,000. Folkes states that although the EPA threshold for pasture land is 1,000 ppm, ARCO has also already offered to remediate pasture land exceeding 250 ppm. Finally, Folkes claims that if remediation of shallow groundwater is necessary, a gravity drain could be installed at lower cost than the PRB proposed by Kane. In Folkes's opinion, however, neither a PRB nor a gravity drain would be effective in reducing arsenic concentrations in the shallow groundwater below Appellants' properties.

¶40 ARCO argues that Appellants' proposed remediation is excessive because there is no evidence that the level of contamination on the properties is "severe" or that the condition of the properties would actually be improved by the proposed abatement.

ARCO claims that not only the cost of remediation, but also the disruption to neighboring properties in Opportunity and surrounding communities would be unreasonable. Despite this argument, ARCO has offered to conduct its own remediation efforts. This is similar to the circumstances addressed by the D.C. Circuit in *Beatty*. In that case, Defendant WMATA moved for summary judgment claiming vibrations from a subway tunnel near Beatty's property constituted a permanent nuisance. *Beatty*, 860 F.2d at 1119. In response, Beatty referred to a report generated by WMATA's own acoustical consultant stating that the vibrations could be reduced. *Beatty*, 860 F.2d at 1119. Because the report was clearly known to WMATA, the court concluded that "WMATA could not properly have asserted there were no genuine issues for trial." *Beatty*, 860 F.2d at 1121-22. In this case, Appellants have proposed one plan with a maximum cost of $101 million; ARCO has proposed alternatives that would partially abate the contamination on some of Appellants' properties at a minimum cost of $82,500. ARCO has not met its summary judgment burden of demonstrating the complete absence of any genuine issue of material fact regarding the reasonableness of abatement. *Lorang*, ¶ 37.

¶41 We have stated that whether contamination continues to migrate may be relevant to a jury's determination of whether the contamination can reasonably be abated. In its order granting summary judgment in favor of ARCO, the District Court concluded that Appellants had failed to identify any evidence establishing a material factual dispute regarding whether the contamination continues to migrate, potentially foreclosing further consideration of the issue by a trier of fact. While migration is not the dispositive factor in determining whether a tort is continuing, migration may be material for a jury to

consider in determining whether abatement is reasonable under the particular circumstances of the contamination. On appeal, ARCO continues to assert that Appellants have offered no evidence of migration, and that the evidence undisputedly shows the contamination has not continued to migrate into or through the soil or groundwater. Appellants, on the other hand, assert that leaching and lateral flow of the arsenic contamination on their properties is continuing. Migration includes any vertical or horizontal movement of contaminants, including leaching, seepage, or percolation. *See United States v. CDMG Realty Co.*, 96 F.3d 706, 715 (3d Cir. 1996); *Hoery*, 64 P.3d at 228.

¶42  The primary evidence offered by Appellants is the expert report prepared by geologist and hydrologist John Kane. Kane developed a remediation plan for Appellants' properties that includes installation of an underground PRB. The PRB would be installed up-gradient from Appellants' properties. Implicit in Kane's plan to install a PRB is the assertion that a PRB is necessary because contaminated groundwater is moving down-gradient. Kane cites a report prepared for ARCO in 1996, which identified two sources of dissolved arsenic in the groundwater, one of which was "contaminated soil due to widespread deposition of smelter emissions." Kane also refers to potential "loading sources for metals to the aquifer" including "leaching of metals from wastes in railroad grade material, from contaminated soils, and from contaminated sediment of the Blue Lagoon." Kane also refers to a monitoring well "downgradient of Yellow Ditch" containing "significantly higher arsenic" than groundwater elsewhere in the area. Kane states that the elevated arsenic concentration in the area of the monitoring well may come

30

from contaminated sediments in Yellow Ditch, contaminated water flowing into Yellow Ditch, or both.

¶43 ARCO offers the rebuttal report from Folkes. Folkes refers to studies concluding "that seepage from creeks and ditches in the site area as well as flood irrigation has caused arsenic to migrate to the groundwater table in the area . . . known as South Opportunity." Folkes argues that installation of a PRB would not be an effective means of remediation because "arsenic in shallow groundwater is the result of a variety of factors, including background and interaction with shallow soils and seepage from irrigation ditches and streams, which would occur on both sides of any wall installed in the area."

¶44 The record presented here does not persuade us that ARCO, as the party moving for summary judgment, met its burden of "making a 'clear showing as to what the truth is'" regarding a complete absence of migration. *Lorang*, ¶ 37 (quoting *Toombs*, 256 Mont. at 284, 846 P.2d at 266). The competing expert reports offered by the parties are sufficient to demonstrate that the issue of whether contamination continues to migrate is appropriate for resolution by a trier of fact. Further, removing this evidence from the jury's consideration would necessarily present them with incomplete information about the characteristics and nature of the contamination. The jury may consider evidence of migration as part of its determination of whether the contamination is reasonably abatable.

¶45 Further, ARCO argues that abatement is unreasonable because Appellants cannot perform the proposed remediation of their properties due to EPA oversight. This

argument is also the subject of two affirmative defenses raised by ARCO, contending that Appellants' claims are in conflict with the remediation plan selected by the EPA and are barred by CERCLA; ARCO's two motions for summary judgment on Appellants' claim for restoration damages, under both CERCLA and Montana law; and Appellants' cross-motion for summary judgment on ARCO's affirmative defenses. These matters have not yet been addressed by the District Court, and we will not address them here. Our discussion is limited to the statute of limitations issue. With respect to the statute of limitations, we must determine only if there is a genuine question of material fact regarding whether the nature of the contamination is such that it can reasonably be abated by some means. The argument raised by ARCO does not address whether the contamination itself is of a type that can reasonably be abated, but raises the separate question of who may perform that abatement. This argument goes to the appropriateness of restoration damages, and is properly decided in the context of the several pending motions on that issue. It would be premature and inappropriate for us to decide at this stage whether Appellants would be able to use a hypothetical award of restoration damages to actually conduct their proposed abatement. We conclude that there are genuine issues of material fact regarding whether the contamination on Appellants' properties can reasonably be abated. The question of reasonable abatability must be decided by the trier of fact. *Burley*, ¶ 91.

¶46 As one final note on damages, we recall that application of the continuing tort doctrine allows recovery of damages incurred during the statutory period immediately preceding the filing of the complaint. *Graveley Ranch*, 240 Mont. at 23, 782 P.2d at 373.

For nuisance and trespass, this period is two years. Section 27-2-207, MCA; *Burley*, ¶ 16. ARCO claims Appellants have produced no evidence of damages sustained during this period. Appellants have claimed, among other things, "reasonable compensation for loss of use and enjoyment of real property," and "reasonable compensation for annoyance, inconvenience, and discomfort . . . ." As we have observed, "[w]here there has been trespass to land, damages for the discomfort and annoyance to the occupant, in addition to damages to the land or for the loss of use of the land itself, have long been recognized." *French v. Ralph E. Moore, Inc.*, 203 Mont. 327, 333, 661 P.2d 844, 847 (1983). Appellants submitted evidence, in the form of their affidavits regarding their use of their properties, sufficient to defeat summary judgment on the question of their subjective annoyance, inconvenience, and discomfort as a result of the contamination on their properties. Given that the issue before us is limited to the statute of limitations, we need not further address the question of available damages should Appellants succeed on their claims. We therefore reverse the order of summary judgment to the extent it requires evidence of continued migration of contaminants, concludes that there is no genuine issue of material fact as to continued migration, and concludes that Appellants have failed to identify facts showing that their proposed abatement was reasonable.

¶47    *3. Whether the continuing tort doctrine can be applied to claims other than nuisance and trespass.*

¶48    In addition to alleging continuing nuisance and trespass, Appellants have filed claims for strict liability, negligence, unjust enrichment, and wrongful occupation of real property. They argue that the continuing tort doctrine should apply to each of these

33

causes of action.[8] Appellants argue that "[w]hen a party causes an object to enter the property of another, through negligent conduct or through abnormally dangerous activity giving rise to strict liability, the party is liable for trespass." Further, they argue that the principle of "holding a responsible party continuously liable for the failure to remove abatable pollution from the property of another," which underlies their nuisance and trespass claims, "applies equally to [Appellants'] wrongful occupation and unjust enrichment claims."

¶49 We begin with Appellants' claim of strict liability. In alleging strict liability for the conduct of an abnormally dangerous activity, Appellants claim "[t]he manner in which [ARCO] mined, milled, smelted, used, disposed, and released such materials at their facilities is and was inappropriate . . . ." Undisputedly, such "mining, milling, smelting, use, disposal, and release" of materials ceased decades ago. A claim based upon strict liability for the conduct of an abnormally dangerous activity, however, does not mean that the defendant is liable simply for the conduct of the activity; it means that the defendant is liable for harm resulting from the activity, even if the defendant acted with reasonable care. *Matkovic v. Shell Oil Co.*, 218 Mont. 156, 159, 707 P.2d 2, 3-4 (1985). Strict liability is not an injury, but a theory by which a plaintiff may attempt to establish a defendant's liability for an injury. *Hoery*, 64 P.3d at 218 ("Liability for nuisance may rest upon any one of three types of conduct: an intentional invasion of a

---

[8] Appellants' complaint also includes a claim of constructive fraud, but they have not argued that the continuing tort doctrine should apply to this cause of action. Their claim of constructive fraud is timely only if the discovery rule, discussed later in this Opinion, is applicable.

person's interest; a negligent invasion of a person's interest; or, conduct so dangerous to life or property and so abnormal or out-of-place in its surroundings as to fall within the principles of strict liability."). If the alleged injury is one which may be considered continuing, such as nuisance or trespass, the plaintiff may allege an appropriate theory of liability associated with that injury.

¶50 The same is true of Appellants' claim of negligence. Appellants allege that ARCO was negligent in that it failed to control and contain toxic substances generated by its operations; failed to prevent toxic materials from migrating to neighboring properties; failed to exercise reasonable care to contain toxins once it knew or should have known it polluted a large area; failed to exercise reasonable care to prevent the escape of toxins; failed to remove the toxic substances from Appellants' properties; and failed to warn Appellants of the scope of and dangers posed by the contamination. Negligence, like strict liability, is not an injury but a theory of establishing liability for an injury. *Barnes v. City of Thompson Falls*, 1999 MT 77, ¶¶ 16-17, 294 Mont. 76, 979 P.2d 1275 (discussing types of nuisance, including nuisance caused by negligence); *see also Hoery*, 64 P.3d at 218. As with strict liability, if the injury is of a nature that may be considered continuing, the plaintiff may allege an appropriate theory of the defendant's liability for that injury.

¶51 We next address Appellants' claim of unjust enrichment. Appellants claim that ARCO's unauthorized use of their property to "dispose of, deposit, and store toxic substances" has benefitted ARCO monetarily, to the detriment of Appellants. Unjust enrichment is traditionally conceived of as an implied contract theory requiring payment

35

for a benefit conferred. *N. Cheyenne Tribe v. Roman Catholic Church*, 2013 MT 24, ¶ 29, 368 Mont. 330, 296 P.3d 450. More broadly speaking, "'[a] person is enriched if he has received a benefit, and he is unjustly enriched if retention of the benefit would be unjust. Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another.'" *Lawrence v. Clepper*, 263 Mont. 45, 53, 865 P.2d 1150, 1156 (1993) (quoting 66 Am. Jur. 2d *Restitution and Implied Contracts* §§ 3-4 (1973)).

¶52 The Restatement (Third) of Restitution and Unjust Enrichment further provides that one who "obtains a benefit by an act of trespass or conversion, by comparable interference with other protected interests in tangible property, or in consequence of such an act by another, is liable in restitution to the victim of the wrong." Restatement (Third) of Restitution and Unjust Enrichment § 40 (2011). Unjust enrichment may arise from interference with real property when the defendant has made valuable use of the plaintiff's property without paying for it. Restatement (Third) of Restitution and Unjust Enrichment § 40 cmt. c. This is exactly the circumstance alleged here.

¶53 Ordinarily, the period of limitations for an unjust enrichment claim begins when all elements of the claim exist or have occurred. *N. Cheyenne Tribe*, ¶ 41 (citing § 27-2-102(2), MCA). We have not previously considered application of the continuing tort doctrine to claims of unjust enrichment. Other courts have reached varying results, depending upon the circumstances of each case. For example, in *Stratton v. Royal Bank of Canada*, 712 S.E.2d 221, 229 (N.C. Ct. App. 2011), the Court of Appeals of North Carolina declined to apply the continuing tort doctrine to the plaintiff's claim that the

bank, after a series of mergers and exchanges, failed to recognize stock certificates issued to her mother some 80 years earlier. Although the plaintiff alleged that failure to recognize the stock certificates had continually deprived her of shareholder rights, the court concluded that these were not continuing violations, but the continuing effects of a single occurrence. *Stratton*, 712 S.E.2d at 230. In another case, the same court applied the continuing tort doctrine to a claim of unjust enrichment where the plaintiff alleged a recurring failure to make monthly salary payments. *Marzec v. Nye*, 690 S.E.2d 537, 542 (N.C. Ct. App. 2010). In that case, refusal to pay the salary month after month constituted a series of continual unlawful acts. *Marzec*, 690 S.E.2d at 542. Noting the divergent outcomes of these cases, the North Carolina court observed that application of the continuing tort doctrine requires consideration of the "particular policies of the statute of limitations in question, as well as the nature of the wrongful conduct and harm alleged." *Stratton*, 712 S.E.2d at 229. We agree that case-specific considerations should play a role in our analysis, while keeping in mind the overarching policy goals of both statutes of limitations and the continuing tort exception.

¶54 The distinguishing characteristic of a continuing tort is that it can be reasonably abated. In this case, even assuming, as Appellants claim, that the alleged nuisance and trespass can be reasonably abated by removal of the contamination on their properties, such removal would not abate or remedy the alleged unjust enrichment of ARCO. The only abatement possible for unjust enrichment under the circumstances of this case is to pay monetary restitution for the value of ARCO's use of the property over the preceding years. If the continuing tort doctrine were applied in cases where abatement is only

possible through the payment of money for past wrongs, any suit seeking damages would arguably qualify as a continuing tort. This is not consistent with the policies underlying the doctrine as an exception to statutes of limitation. We decline to apply the continuing tort doctrine to Appellants' claim of unjust enrichment under the circumstances of this case.

¶55 Appellants' final cause of action is for wrongful occupation. The District Court applied the two-year statute of limitations applicable to commencement of an action upon a liability created by statute. Section 27-2-211, MCA. The District Court presumably reached this conclusion based on § 27-1-318, MCA, which provides the measure of damages to be applied in a case of wrongful occupation:

> The detriment caused by the wrongful occupation of real property in cases not otherwise provided for in this code is deemed to be the value of the use of the property for the time of such occupation, not exceeding 5 years next preceding the commencement of the action or proceeding to enforce the right to damages, and the costs, if any, of recovering the possession.

¶56 The application of a two-year statute of limitations, as set forth in § 27-2-211, MCA, would, in most cases, conflict with a provision allowing recovery of damages for the preceding five years as set forth in § 27-1-318, MCA. Further, a statute that establishes the measure of damages does not establish the underlying liability. *See* 37 C.J. *Limitations of Actions* § 123 (1925) (The phrase 'liability created by statute' means a liability which would not exist but for the statute . . . ."). For example, Title 27 includes a number of statutes providing the measure of damages for various causes of action based on contractual obligations. Sections 27-1-311 (breach of contract), -312 (breach of obligation to pay money), -314 (breach of agreement to convey real property), -315

38

(breach of agreement to buy real property), MCA. In such cases, it is the contract, not the statute establishing the measure of damages, which creates liability.

¶57    Claims of wrongful occupation have traditionally arisen in response to a claim of adverse possession, or in other circumstances where one person has occupied or possessed the land of another. *Weter v. Archambault*, 2002 MT 336, ¶ 32, 313 Mont. 284, 61 P.3d 771 (affirming district court conclusion that refusal to sign quit-claim deeds was not "wrongful occupation" in the sense recognized by previous cases); *Goodover v. Lindey's, Inc.*, 255 Mont. 430, 434, 843 P.2d 765, 767 (1992) (wrongful occupation in boundary dispute where defendant constructed restroom and underground storage tanks that occupied the disputed area); *Smithers v. Hagerman*, 244 Mont. 182, 797 P.2d 177 (1990) (claim of adverse possession defeated and damages for wrongful occupation awarded where garage and septic system encroached on neighboring property); *Martin v. Randono*, 175 Mont. 321, 329, 573 P.2d 1156, 1161 (1978) (plaintiff who maintained residence on the property from 1959 through 1971 conceded liability for wrongful occupation when claim of adverse possession failed); *Pritchard Petroleum Co. v. Farmers Coop. Oil & Supply Co.*, 121 Mont. 1, 4, 190 P.2d 55, 57 (1948) (damages awarded for wrongful occupation where "respondent entered upon the property and took possession of all of it and used and occupied the premises" from 1935 until 1942).

¶58    Our cases on wrongful occupation have not directly addressed the statute of limitations issue. A review of our cases reveals, however, that the claim is not considered time-barred even if it was filed many years after the occupation first began. *Martin*, 175 Mont. at 323, 573 P.2d at 1158 (1978) (claim filed in 1972, where permissive use of the

39

land ended as early as 1965); *Pritchard*, 121 Mont. at 4-6, 190 P.2d at 57 (claim filed in 1941, where occupation began in 1935). The language of § 27-1-318, MCA, limiting damages to the five years immediately preceding the commencement of the cause of action, also suggests that a cause of action could be brought more than five years after a wrongful occupation of real property has begun—there would be no need, otherwise, to limit the period of recovery. The accrual of a claim of wrongful occupation is not the first date of occupation.

¶59 We have not had occasion to consider accrual of such a claim after the occupation has ended, for the practical reason that a claim of wrongful occupation is so often brought in an effort to regain the property from the party wrongfully in possession. Indeed, that is the case here, where Appellants claim ARCO continues to wrongfully occupy their properties by allowing the ongoing presence of contamination. In addressing the statute of limitations issue, we are not asked to address whether Appellants' claim that ARCO continues to "occupy" their properties through the continued presence of contaminants is "'wrongful occupation' in the sense that our previous cases have recognized it." *Archambault*, ¶ 32. We conclude only that the claim may be considered continuing. The District Court erred in applying the two-year statute of limitations found in § 27-2-211, MCA, given the statutory provisions of § 27-1-318, MCA, limiting recovery to the five-year period preceding commencement of the action.

¶60 *4. Whether the facts constituting Appellants' claims were concealed or self-concealing, or whether ARCO took action preventing Appellants from learning those facts.*

40

¶61     The fact that a party does not know that he or she has a claim, whether because he or she is unaware of the facts or unaware of his or her legal rights, is usually not sufficient to delay the beginning of the limitations period.  Section 27-2-102(2), MCA; *State ex rel. Egeland v. Cut Bank*, 245 Mont. 484, 488, 803 P.2d 609, 611-12 (1990); *Bennett v. Dow Chem. Co.*, 220 Mont. 117, 120-21, 713 P.2d 992, 994 (1986).  The discovery rule constitutes an exception to this general principle, stating that if the facts constituting the claim are concealed or self-concealing in nature, or if the defendant has acted to prevent the injured party from discovering those facts, the period of limitations does not begin to run until the injured party has discovered, or in the exercise of due diligence should have discovered, both the injury and its cause.  Section 27-2-102(3), MCA; *Draggin' Y Cattle Co. v. Addink*, 2013 MT 319, ¶ 21, 372 Mont. 334, 312 P.3d 451; *Bennett*, 220 Mont. at 121, 713 P.2d at 995.  Further, the statute of limitations pertaining to actions based on fraud specifically provides that such a claim does not accrue until discovery of the facts constituting the fraud.  Section 27-2-203, MCA.  Reading §§ 27-2-102 and -203, MCA, together, we have concluded that "the statute of limitations for an action based on fraud begins when the fraud occurs unless the facts which form the basis for the allegation are, by their nature, concealed."  *Cartwright v. Equitable Life Assurance Socy.*, 276 Mont. 1, 14, 914 P.2d 976, 985 (1996).

¶62     The presence of latent disease or the nondisclosure of information are classic examples of injuries that may be, by their nature, self-concealing.  *Kaeding v. W.R. Grace & Co.*, 1998 MT 160, ¶ 17, 289 Mont. 343, 961 P.2d 1256; *Blackburn v. Blue Mountain Women's Clinic*, 286 Mont. 60, 79, 951 P.2d 1, 12 (1997).  An injury that is not apparent

to the layperson because of its complexity, and which can ultimately only be discovered by professional analysis, may also be considered self-concealing. *Draggin' Y*, ¶ 23; *Stanley L. & Carolyn M. Watkins Trust v. Lacosta*, 2004 MT 144, ¶ 42, 321 Mont. 432, 92 P.3d 620. This principle is applied in professional malpractice cases, where we have held that a party is entitled to rely on professional advice without the burden of hiring a second expert to monitor the work of the first. *Watkins Trust*, ¶ 42.

¶63 The statute of limitations may also be tolled where the plaintiff is aware of his or her injury, but is unable to discern the cause of that injury despite the exercise of due diligence. *Nelson v. Nelson*, 2002 MT 151, ¶ 18, 310 Mont. 329, 50 P.3d 139; *Hando v. PPG Indus.*, 236 Mont. 493, 502, 771 P.2d 956, 962 (1989). An example of this is where the symptoms of an illness are immediately apparent, but the illness is diagnosed as the result of chemical exposure only years later. *Nelson*, ¶ 18; *Hando*, 236 Mont. at 502, 771 P.2d at 962. This is true even where plaintiffs have asserted long-standing beliefs or suspicions regarding the link between the symptoms and their ultimate cause. *Nelson*, ¶ 18; *Hando*, 236 Mont. at 501, 771 P.2d at 962 (tolling statute of limitations until plaintiff's suspicions regarding cause of her injury were confirmed by medical diagnosis).

¶64 Although the plaintiff's mere suspicions will not trigger the running of the limitations period, the plaintiff need not have actual and complete knowledge of the facts constituting the claim in order for the claim to accrue. *Mobley v. Hall*, 202 Mont. 227, 233, 657 P.2d 604, 607 (1983) (construing § 27-2-203, MCA). Under the discovery rule, the claim accrues when the plaintiff is given notice or information that would prompt a reasonable person to conduct further inquiry. *Mobley*, 202 Mont. at 232, 657 P.2d at 607.

If the plaintiff is given such notice and yet fails to exercise reasonable diligence, the limitations period will not be tolled. *Kaeding*, ¶ 27. Thus, even if the facts constituting a claim are otherwise self-concealing in nature, if the plaintiff has received notice of a possible claim and failed to act diligently in pursuing that claim, the action may be time-barred. *Kaeding*, ¶ 27. Where material factual questions exist as to whether the facts constituting the claim were concealed or self-concealing, whether the defendant acted to prevent discovery of those facts, or whether the plaintiff exercised due diligence, those questions must be resolved by the trier of fact. *Johnston v. Centennial Log Homes & Furnishings, Inc.*, 2013 MT 179, ¶ 36, 370 Mont. 529, 305 P.3d 781; *Burley*, ¶¶ 92-95 (factual disputes implicating affirmative defense based on statute of limitations to be resolved by jury).

¶65 Appellants argue the discovery rule should be applied for two reasons: first, because their claims are self-concealing in nature; and second, because ARCO represented that the community of Opportunity was "clean," thereby discouraging Appellants from conducting further inquiry. In support of this first point, Appellants argue that although they were aware of smelter operations, the resulting discharge of arsenic and other materials onto area properties, and highly-publicized environmental remediation plans, they had no way of knowing the extent of contamination on each of their individual properties. Citing *Blackburn*, 286 Mont. at 79, 951 P.2d at 12, they claim that discovery of the pollution on their properties would have required specialized testing, and therefore should be considered self-concealing. Further, Appellants' claim of constructive fraud is based on ARCO's alleged failure to fully disclose the extent of the

43

contamination, and the non-disclosure of information may also be considered self-concealing. *Blackburn*, 286 Mont. at 79, 951 P.2d at 12.

¶66    The facts of this case are distinguishable from *Blackburn*, in which we observed that the plaintiff "had no reason to suspect" that a medical provider had given her inaccurate information. *Blackburn*, 286 Mont. at 79, 951 P.2d at 12. Here, many of the Appellants admitted that they were aware of the possibility, even likelihood, their properties had been harmed. Although it is true that "mere suspicion may not constitute discovery," information sufficient to "lead a prudent [person] to inquiry or action" is enough to trigger the running of the limitations period. *Mobley*, 202 Mont. at 233, 657 P.2d at 607. Here, the record shows that Appellants had far more than "mere suspicion" that their properties were contaminated, and should reasonably have been prompted to further inquiry or action.

¶67    The history of arsenic contamination in Opportunity, Anaconda, and surrounding communities is well-known to residents of the area. As Appellant Robert Phillips poignantly stated about his childhood in Opportunity: "We grew up in arsenic." Ilona Schlosser described the pervasive public knowledge of contamination in the area: "When you first start to think about contamination—I think you live with it. I think you're always thinking about it. I don't think that ever leaves your—I think you're in the eye of the smelter. You're in the base camp. You always know there's a potential problem. . . . I mean you'd have to be a moron not to figure that out." Zane Spehar recalled that he had been aware of the possibility of contamination for many years, reasoning: "Well, with all the contamination around in that area, I mean how can it not be in my yard?" Other

44

Appellants, who described witnessing cleanup efforts at their neighbors' properties or in their communities over the years, had similar sentiments.

¶68    Public documents and news coverage from the last few decades bear out the assertion that the potential for arsenic contamination on residential properties was common knowledge in the area. A 1985 article in Butte's daily newspaper, The Montana Standard, announced that a team from the Centers for Disease Control was testing arsenic levels in the urine of children in the communities of Anaconda and Opportunity. At least two Appellants specifically recalled their children being subjected to this testing; one recalled that her young son was given a dollar for his urine sample.

¶69    In association with the designation as a Superfund site, extensive efforts were made to keep the public informed about the contamination and cleanup efforts. A 1990 article in another local newspaper, the Anaconda Leader, notified the public that the cleanup plan was available for public inspection at the Hearst Free Library in Anaconda. The article stated, "Of primary interest to most persons in Anaconda and Deer Lodge County is the former smelter site and areas in the eastern part of the county which have been identified as being contaminated during decades of smelter operation." Opportunity is located in the eastern part of Anaconda-Deer Lodge County. In 2001, an article in the Montana Standard described testing of the "arsenic-laden Opportunity Ponds," stating that although no significant contamination had yet been observed in the area's drinking water, "officials fear a moving 'plume' of contaminated groundwater may eventually reach the wells of Opportunity homeowners."

¶70 A Community Protective Measures Program developed by ARCO and EPA in 2002 included five components:

- Educational information describing potential risks, recommendations to reduce exposure to residual contaminants in soils, and operation and maintenance measures to ensure the long-term viability of this remedy will be made available to the public by Atlantic Richfield at the Hearst Library, ADLC Courthouse, and Atlantic Richfield offices. The information will also be provided to banks and realtors in the Anaconda community.

- A single mass mailing of information to all residents of ADLC, within the SPAOD, that briefly describes "Superfund" activities within ADLC, provides educational information, and briefly describes the ADLC Development Permit System ("DPS").

- Atlantic Richfield will provide for residential soils sampling for current residents (that have not been previously sampled) within the CSOU for three years. Landowners within the CSOU will have the opportunity to have their current residential property samples upon request from the landowner. Sampling will be conducted by Atlantic Richfield or by a third party through a contract with Atlantic Richfield.

- Atlantic Richfield will run a full page add in the local newspaper once a year for three years that provides educational information and provides phone numbers for sampling and/or additional information.

- Atlantic Richfield will develop a database to track and store the following: 1) informational material distribution; and 2) sampling results and remediation status for affected residential properties within the CSOU. Atlantic Richfield or their designee will maintain the database.

In 2003, ARCO conducted the required mass mailing, which informed homeowners of the following:

Areas were identified after soil samples were taken in the early 90's, providing data that led the [EPA] and Atlantic Richfield Company representatives to anticipate elevated levels of arsenic in specified areas. . . . The Focus Areas in the surrounding regional area include a small portion of Opportunity [and] Crackerville.

46

Full-page newspaper ads were placed in the Montana Standard and the Anaconda Leader annually during the years 2002 through 2005. Residential soil sampling was available by request of property owners from 2002 through 2008. The soil testing program was described in articles in the Montana Standard and Anaconda Leader in 2002, 2003, and 2004, each of which specifically stated that the "focus area" included not just Anaconda, but parts of Opportunity and other outlying areas. One article encouraged homeowners to "clear up any nagging doubts about what's in their dirt." Many Appellants requested and received sampling at ARCO's expense through this program.

¶71 Although environmental contamination that is invisible to the senses and requires specialized testing to detect may be considered a self-concealing injury, an injury is no longer self-concealing for purposes of the discovery rule where a potential plaintiff has notice of the injury sufficient to prompt a reasonable person to further inquiry. *Kaeding*, ¶ 27; *Mobley*, 202 Mont. at 233, 657 P.2d at 607. The benefit of the discovery rule is available only where the injury cannot be discovered despite the exercise of due diligence. *Nelson*, ¶ 14. In response to the almost overwhelming evidence of public knowledge produced by ARCO, several Appellants claim that although they were aware their properties were within a Superfund site, they did not know what "Superfund" meant. One, in particular, recalled seeing two properties on his street where a new driveway or a new lawn was installed because "they found arsenic or something." Despite this, he "never went over and [said], 'What are you doing?'" This cannot be said to demonstrate the exercise of due diligence. Appellants cannot avail themselves of the benefit of the discovery rule under these circumstances.

¶72 Appellants also argue that testing provided by ARCO did not offer a comparison to naturally-occurring background levels of arsenic, and therefore did not fully inform them as to whether their properties were contaminated at a level below the EPA-approved threshold of 250 ppm. The fact that Appellants were not given actual notice of all of the facts underlying their claim does not establish that those facts could not have been discovered through the exercise of due diligence. (Indeed, Appellants were able to discover the naturally-occurring arsenic levels in Opportunity by retaining an expert in the course of this litigation; they offer no reason why this effort could not have been made years earlier.) To the extent that this alleged non-disclosure supports Appellants' allegations of constructive fraud, Appellants had sufficient notice of the facts to prompt them to inquire whether ARCO had fully and accurately represented the state of their properties. Where Appellants were aware, despite ARCO's alleged representations to the contrary, of the likelihood that their properties were contaminated, the alleged non-disclosure was not self-concealing. On the record before us, there is no material factual dispute regarding whether the facts constituting the claims were concealed or self-concealing and whether Appellants exercised due diligence in attempting to discover those claims.

¶73 Appellants also argue that ARCO discouraged them from conducting further inquiry, effectively acting to conceal the facts underlying their claims, by consistently representing that their communities were "clean." The statute of limitations is tolled only where the defendant has engaged in fraudulent concealment or affirmatively prevented the injured party from discovering that he or she has been injured. *Cartwright*, 276 Mont.

at 14-15, 914 P.2d at 985. Fraudulent concealment consists of "'the employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquisition of information disclosing a cause of action.'" *Cartwright*, 276 Mont. at 17, 914 P.2d at 986 (quoting *Monroe v. Harper*, 164 Mont. 23, 28, 518 P.2d 788, 790 (1974)). Fraudulent concealment is to be distinguished from Appellants' claim of constructive fraud, which does not require intent to deceive. *Hartfield v. Billings*, 246 Mont. 259, 263, 805 P.2d 1293, 1296 (1990).

¶74 Appellants cite depositions and documents establishing that based on an investigation conducted in 1996, ARCO concluded, and represented to the public, that the community was not at risk. This assessment was based on the EPA threshold of 250 ppm. The depositions referred to by Appellants include statements that ARCO made these representations under the belief that "in general, with the science that we had at the time, basically [the representation that the community was not at risk] was accurate." The evidence referred to by Appellants shows that ARCO relied on EPA-approved standards and accurately represented those standards and its sampling results to the public. Appellants have not established a material factual dispute regarding whether ARCO acted to prevent inquiry or hinder the acquisition of information. The record demonstrates that after these representations were made in 1996, additional soil testing was offered and information about the contamination and cleanup was continually made publicly available.

¶75 Appellants also refer to letters received in 2006 and 2007, after soil samples from their properties were tested by ARCO, concluding that arsenic levels on their properties

were "below the EPA set standard residential arsenic action level of 250 parts per million; therefore further sampling or remediation is not required in your residential yard." The letters further promised, "A final report will be provided to you at the conclusion of this project." Those Appellants whose properties contained arsenic concentrations exceeding 250 ppm were provided with more detailed sampling results and offered remediation.

¶76 Appellants do not allege that the sampling results obtained by ARCO were fraudulent or otherwise inaccurate. ARCO also notified Appellants of the EPA-mandated action level for residential properties and whether remediation of their properties was required under that standard. Appellants do not allege that ARCO misrepresented the EPA action level or the remedial actions required by EPA. Appellants further do not allege that ARCO prevented them from conducting independent testing. The evidence pointed to by Appellants shows that, instead of preventing inquiry or hindering the acquisition of information, ARCO provided Appellants with information regarding the levels of arsenic contamination on their properties. Again, ARCO relied on EPA-approved standards and accurately represented those standards and its sampling results to Appellants. Appellants clearly believe that the EPA-approved residential action level is inappropriate. This difference of opinion does not render ARCO's representations fraudulent, and does not demonstrate the existence of a material factual dispute regarding whether Appellants were affirmatively prevented from discovering the facts underlying their claims. Appellants may not avail themselves of the discovery rule in this matter.

## CONCLUSION

¶77    We hold that a claim of continuing nuisance or trespass based on environmental contamination does not require evidence that the contamination is migrating. Appellants' claims of continuing nuisance and trespass are not time-barred if it can be determined by a finder of fact that the contamination is reasonably abatable. The crucial consideration for the trier of fact in determining whether a tort is permanent or temporary, and thus continuing, is whether the tort can be discontinued or abated. Migration is a characteristic of the contamination that may affect the jury's determination of reasonable abatability. We reverse the District Court's conclusion that Appellants produced no evidence of migration, and hold that a jury may consider the issue. We reverse the grant of summary judgment to ARCO on Appellants' claims of continuing nuisance and trespass, and remand for further proceedings on the issue of reasonable abatability. If the contamination is not found to be reasonably abatable, the statute of limitations will not then be tolled by application of the discovery rule. Strict liability and negligence, as theories of liability for an underlying injury, may be considered subject to the continuing tort doctrine if the alleged injury is of a continuing nature. The viability of these claims will also depend on the jury's determination regarding reasonable abatability.

¶78    Under the facts of this case, Appellants' claim of unjust enrichment is not subject to the continuing tort doctrine. The discovery rule will not toll the statutes of limitations applicable to Appellants' claims of unjust enrichment and constructive fraud, because Appellants had sufficient information regarding the presence of contamination to reasonably prompt them to further inquiry. These claims are time-barred, and we affirm

51

the District Court's grant of summary judgment to ARCO on Appellants' claims of unjust enrichment and constructive fraud. The wrongful occupation alleged by Appellants may be considered continuing, and thus not time-barred. The District Court applied the incorrect statute of limitations to this claim, and we reverse. As noted, we do not address any potential impact on the case of ARCO's affirmative defenses that the District Court has not yet addressed.

¶79     Affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.

/S/ LAURIE McKINNON

We Concur:

/S/ PATRICIA COTTER

Justice Beth Baker, concurring.

¶80     I concur in the decision to reverse summary judgment in favor of ARCO on the Plaintiffs' continuing tort claims. I agree that evidence of migration is not necessary to establish a continuing tort and I join the Court's Opinion with respect to Issues Three and Four. I join the Court's resolution of Issue Two and much of the discussion, as I also agree that the record reveals genuine issues of material fact on whether contamination continues to migrate. I do not join the Court's discussion of Issue One, and I would not situate migration as a component of abatability as the Court does in that section.

¶81     In *Burley*, we were tasked with explaining how three factors—stabilization, migration, and abatability—bear on continuing nuisance doctrine. We explained the importance of these factors through the prism of their relation to the "one consistent

52

theme [discerned from] the historic decisions of this Court to evaluate whether a nuisance should be classified as temporary or permanent: whether the injury is sufficiently complete to ascertain permanent damages." *Burley*, ¶ 41. Our decision in *Burley* reflects that stabilization, migration, and abatability each bear independently on whether an "injury is sufficiently complete to ascertain permanent damages." *Burley*, ¶ 41. I would not abandon that analysis today.[1]

¶82    Both the Court's Opinion and Justice Rice's Dissent barely mention the concept of stabilization. The neglect of this factor is understandable after *Burley*, in which we simply assumed from the certified question that the pollution had stabilized because the concentration of the pollutants was no longer increasing. *Burley*, ¶ 2. We proceeded to analyze, and ultimately rejected, BNSF's argument that the stabilization *of contamination* provides a "bright line rule" on whether a nuisance is permanent or temporary. *Burley*, ¶ 51.

¶83    But our precedent, including *Burley*, reflects that stabilization is not as narrow a concept as the issue before us in *Burley*. Rather, when referring to stabilization, we often have focused on whether the injury itself is stable or changing. *See Burley*, ¶ 21 ("The concept of *an injury* having 'stabilized' first appears in *Blasdel*.") (emphasis supplied).

---

[1] Justice Rice's Dissent posits that the "complained of injury" in a continuing tort must be both "(1) recurring and (2) remediable," and would analyze claims by that lodestar. Dissent, ¶ 103. Although differently phrased, this is essentially the same standard that we employed in *Burley* and that I employ today—"whether the injury is sufficiently complete to ascertain permanent damages." Whether the injury is sufficiently complete speaks to whether the injury continues to occur (the Dissent's first factor) and whether damages are permanent speaks to whether the injury is remediable (the Dissent's second factor).

¶84 For instance, in *Graveley I*, where lead batteries were not increasing but were removable, we held that the nuisance was continuing in that "a new cause of action may arise each time a cow becomes ill or dies as a result of lead poisoning." In other words, the injury—the cows becoming sick or dying—had not stabilized, so the injury was not complete, and the tort was continuing. *Graveley I*, 240 Mont. at 25, 782 P.2d at 375. In *Haugen Trust*, we stated that the "situation" had "not stabilized" not only because the nuisance itself was fluctuating (through intermittent floods), but also because the extent of the damage depended on "the condition" of the basement at the time of each occurrence. *Haugen Trust*, 204 Mont. at 513, 665 P.2d at 1135. The "condition" of the basement "presumably" referred to the extent to which the basement was "finished," what "personal items" were "stored" there, and whether the basement had "dried completely since the previous flooding." *Burley*, ¶ 27. In other words, in *Haugen Trust*, there was a continuing tort because the injury was still developing. *Haugen Trust*, 204 Mont. at 513, 665 P.2d at 1135. And in *Burley*, we discussed *Shors* in the context of stabilization, noting that in that case where the nuisance was easily abatable, "[a] new cause of action arose each day that the gate obstructed Shors's free use of his easement." In other words, the injury had not stabilized because the nuisance was continuing to inflict a new harm whenever Shors encountered it. *Burley*, ¶ 33 (citing *Shors*, 221 Mont. at 397, 720 P.2d at 244).

¶85 This Court did not even use the term "migration" in its continuing tort analysis before *Burley* in 2012, and did so then only at the behest of the Federal District Court's certified question. *See Burley*, ¶ 2. Of the Montana cases cited in *Burley*'s migration

analysis, *Burley*, ¶¶ 69-72, none in fact employ the term "migration"—and most instead employ the term "stabilization" or a variation thereof—to describe what is at base common phenomena: uncertainty or lack of completeness in injuries. *See, e.g.*, *Blasdel*, 196 Mont. at 426, 640 P.2d at 894.

¶86 Based on the foregoing, I would conclude that migration and stabilization both are "important factor[s]," *Burley*, ¶ 73, that bear on whether an injury is sufficiently complete or whether it is dynamic and subject to change. Justice Rice's Dissent, in my view, proffers a similar theory: that our jurisprudence requires a recurring injury—which may be demonstrated through evidence of migration or lack of stabilization—for a continuing tort to lie. I depart from Justice Rice's analysis[2] in interpreting the concept of stabilization, which in our jurisprudence is broader than merely the stabilization of contamination. Whether *the injury* has stabilized is what we are after. And rightly so.

---

[2] I also depart from Justice Rice's Dissent regarding how the discovery rule factors into our analysis of the statute of limitations for alleged continuing nuisance and trespass claims. Dissent, ¶¶ 101-102, 120. Justice Rice suggests that a continuing nuisance or trespass must meet the statutory discovery exception in order to escape the statute of limitations bar. Dissent, ¶ 102. But the statute also prescribes the general "accrual rule" for commencing the period of limitation. Section 27-2-102(1)(a), (2), MCA. "The discovery rule begins the statute of limitations when the plaintiff discovers or should have discovered the negligent act. . . . The statute of limitations does not begin to run under the accrual rule until all elements of the claim have occurred." *Ehrman v. Kaufman*, 2010 MT 284, ¶ 12, 358 Mont. 519, 246 P.3d 1048. We addressed application of the discovery rule in *Burley* and disposed of it unanimously: "[T]he discovery rule definitively would bar a property contamination tort action at the expiration of the limitations period only where the injury had become permanent in the sense that the injury no longer reasonably could be abated, or had abated to a point where permanent damages could be ascertained." *Burley*, ¶ 47. The continuing tort doctrine relates to the accrual of the cause of action, which occurs only when the right to maintain an action on the claim is complete. Section 27-2-102(1)(a), MCA. In the context of a continuing nuisance or trespass, this occurs when the injury is sufficiently complete to ascertain permanent damages. *Burley*, ¶ 41. *See Blasdel,* 196 Mont. at 426, 640 P.2d at 894 (holding that a cause of action for a permanent taking did not accrue until the water table had "stabilized" in 1960).

Our stabilization jurisprudence recognizes the unique nature of environmental harm and the nuisance cause of action. Environmental harm has the ability to affect disparate persons long after the conduct creating it has occurred, and nuisance focuses on interference with a landowner's use and enjoyment of her property. Put these two together and it means that an environmental injury may not be sufficiently complete to ascertain permanent damages until the nuisance is in fact abated (if it reasonably can be), and is no longer affecting the landowner's property interests. See Opinion, ¶ 22.

¶87 Where I believe the Court goes wrong is in situating migration—and, by implication, stabilization—within reasonable abatability. As we stated in *Burley*, the key question "in evaluat[ing] whether a nuisance should be classified as temporary or permanent" is "whether the injury is sufficiently complete to ascertain permanent damages." *Burley*, ¶ 47. By putting all the eggs in the "reasonably abatable" basket, the Court focuses exclusively on the second element of this standard, dealing with whether damages are "permanent." Stabilization and migration are independent factors because they bear directly on the first element of the standard—whether the injury is "complete." *See Burley*, ¶ 15 (noting 58 Am. Jur. 2d *Nuisances* § 296's description of nuisances as temporary when the "injury is not complete" because the injury depends upon things like "its continuance and uncertain operation of the seasons or of the forces set in motion by it."). Moreover, for the reasons stated in Justice Rice's Dissent in ¶¶ 111-12, and 116, situating stabilization and migration within reasonable abatement is not consistent with *Burley* or with our prior jurisprudence. We could have situated migration within

abatability in *Burley*, but we chose not to, and for good reason. *See Burley*, ¶ 89 (listing the factors bearing on reasonable abatability, of which migration is not one).

¶88    Nonetheless, because I agree that proving migration is not required for a continuing nuisance, and that Plaintiffs in any event have a raised genuine issues of material fact both with respect to migration and reasonable abatement, I concur with the Court's decision to remand for a jury's consideration of those factors. I also agree with the Court that, if the jury does not find a continuing tort, the discovery rule does not toll the statute of limitations in this case.


/S/ BETH BAKER


Justice Michael E Wheat, concurring in part and dissenting in part.

¶89    I concur with the Court's resolution of Issues 1, 2, and 3, but I dissent on Issue 4, because, under the facts of this case, the questions of concealment, misrepresentation, and reasonable diligence, in the context of the "discovery rule," are questions of fact to be decided by the jury, not the court.

¶90    ARCO has been actively engaged in the forced clean-up of contamination in and around the Butte-Anaconda area, including Opportunity, for decades. Through that process ARCO has developed reams of information related to the extent and location of the contaminants. Such involvement has placed ARCO in a position to decide what information it should disseminate to the public. There is no dispute that ARCO disseminated plenty of information to the public, through various mediums, which was sometimes general in nature and sometimes specific to the Appellants in this case. The

question dispositive to ARCO's defense is whether this information was sufficiently self-concealing, or presented in such a way to persuade the Appellants that they had nothing to fear or had not been injured. The answer to this question is fact intensive and should be decided by the jury. It is not the Court's job to sort through the disputed facts and interpret them one way or the other—that is the jury's responsibility. Therefore, I would reverse the District Court's decision that "the running of the statutes of limitations on the Plaintiffs' claims is not tolled by Section 27-2-102(3)."

¶91 As the Court notes:

> The fact that a party does not know that he or she has a claim, whether because he or she is unaware of the facts or unaware of his or her legal rights, is usually not sufficient to delay the beginning of the limitations period. The discovery rule constitutes an exception to this general principle, stating that if the facts constituting the claim are concealed or self-concealing in nature, or if the defendant has acted to prevent the injured party from discovering those facts, the period of limitations does not begin to run until the injured party has discovered, or in the exercise of due diligence should have discovered, both the injury and its cause.

Opinion, ¶ 62 (citations omitted). Under the discovery rule, the claim accrues when the plaintiff is given notice or information that would prompt a reasonable person to conduct further inquiry. *Mobley v. Hall*, 202 Mont. 227, 233, 657 P.2d 604, 607 (1983) (construing § 27-2-203, MCA).

¶92 Appellants argue the discovery rule should be applied for two reasons: first, because their claims are self-concealing in nature; and second, because ARCO represented that the community of Opportunity was "clean," thereby discouraging Appellants from conducting further inquiry. The Opportunity Citizens filed their claims on April 17, 2008. The Court notes that the statute of limitations applicable to its

analysis is three years. Opinion, ¶ 14. Thus, to prevail on its defense, ARCO must prove the Opportunity Citizens knew, or should have known, of the facts constituting their claims before April 17, 2005. Whether any of the Opportunity Citizens should have known of the facts constituting their claims earlier is a highly factual inquiry inappropriate for summary judgment in this case.

¶93 Under Montana law, knowledge of a self-concealing injury, sufficient to trigger the statute of limitations, requires knowledge of both the injury and its cause. *Hando v. PPG Indus., Inc.*, 236 Mont. 493, 501, 771 P.2d 956, 961-62 (1989). ARCO inundated the District Court with thousands of pages of exhibits, to prove that most of the Opportunity Citizens were aware the Anaconda Company smelted copper in Anaconda, Montana, and were further aware the operation resulted in some environmental damage in the area. However, ARCO failed to demonstrate that the Opportunity Citizens knew, or should have known, their properties were contaminated by arsenic and other pollutants.

¶94 In fact, many of the exhibits offered by ARCO were confusing and misleading to the reader. For example, the full page ads in the Anaconda Leader that Appellants claim ARCO took out to provide citizens with "information describing potential health risks, precautions to mitigate those potential risks and answers to frequently asked questions" contained somewhat ambiguous language. In at least one of these ads, it stated:

> Q 8: What happens if analysis determines my property exceeds the average
> arsenic concentration level of 250 ppm?
> A: First, don't be alarmed; this is information that will help you. You will
> be informed that more extensive sampling is necessary for your property. If

some cleanup is required, Atlantic Richfield Company and EPA, along with yourself will agree on the appropriate cleanup plan for your property. . . .

Q 9: What will I have to show for my cooperation and participation in these activities?
A: You will learn that your property does not pose health risks to you, your children, or future owners or renters.

¶95 Additionally, the Court identifies letters dated in 2006 and 2007 that ARCO sent to many of the Appellants after conducting soil testing. It claims that these letters indicate that Appellants knew their properties were contaminated with arsenic. Opinion, ¶ 76. I do not agree. The letters were also potentially misleading regarding the safety and contamination of Appellants' properties. For example, many of them included:

Although remedial action activities are still ongoing . . . Atlantic Richfield Company and EPA would like to provide you the preliminary results from the sampling at this time.

The weighted average arsenic concentrations for soil samples collected from your property are attached to this letter. Your results are below the EPA set standard residential arsenic action level of 250 parts per million; therefore further sampling or remediation is not required in your residential yard.

¶96 The Court also points to several Appellants' deposition statements that they recalled reading news articles about Environmental Investigation and Cleanup in the area surrounding their properties before April 17, 2005. However, ARCO only identified seven such Appellants. As there are over 90 Appellants, it is unclear whether all of the Appellants were aware of any news about environmental cleanup or concern in the area.

¶97 In nearly all of ARCO's depositions of Appellants, ARCO asked (in slightly varying language) whether the Appellants could recall any misrepresentations that ARCO had made about the contamination. Many of the responses suggested that in some way

60

ARCO did in fact misrepresent to the citizens of Opportunity regarding the quality of their property. In fact, in one public meeting, ARCO's Sandra Stash stated, "I think the real good news out of this whole thing is that this community is not at risk," and "95 percent of the community . . . does not need to worry about [arsenic concentrations in residential soils]." Also, in ARCO's post-testing letters to Plaintiffs dating back as far as 2000, ARCO told Plaintiffs with properties testing below 250 ppm that "[y]our results are below the EPA set standard residential arsenic action level of 250 parts per million; therefore further sampling or remediation is not required in your residential yard."

¶98    The Opportunity Citizens' claims are all based on damage to their properties, caused by the spread of contaminates from ARCO's operations. Knowledge of the facts constituting the claims would necessarily include knowledge that contaminates from ARCO's operations harmed each Opportunity Citizen's individual property. With respect to the individual Opportunity Citizens, ARCO cited no evidence at all to suggest they know, or had any means of knowing, whether contamination existed on their individual properties. Most of the Opportunity Citizens also confirmed their lack of understanding of the impact to their property in their depositions. While some Opportunity Citizens testified they "suspected" ARCO's activity may have harmed their properties, they had no means of discovering just how bad things were.

¶99    When evaluating the highly individual and factually intense question of when the Opportunity Citizens should have learned their property was contaminated, the court and jury should consider the complexities of environmental investigation. Ultimately, the trier of fact should decide, based on all of the evidence, when the Opportunity Citizens

possessed sufficient knowledge of ARCO's invisible and toxic contamination on their properties.

/S/ MICHAEL E WHEAT

Justice James Jeremiah Shea and Judge James A. Manley join in the concurring and dissenting Opinion of Justice Michael E Wheat.

/S/ JAMES JEREMIAH SHEA
/S/ JIM MANLEY
District Court Judge Jim Manley
sitting for Chief Justice Mike McGrath

Justice Rice, dissenting in part and concurring in part.

¶100  I dissent, and will address Issue 1.  The Court holds that the application of the continuing tort doctrine to Appellants' claims of nuisance and trespass does not require evidence of the continued migration of contaminants.  In so doing, the Court concludes that only those nuisances and trespasses that cannot reasonably be remediated are burdened by a statute of limitations.  In my view, this is an impermissible infringement on the Montana Legislature's power to enact statutes of limitations and is inconsistent with this Court's precedent regarding the continuing tort doctrine.  The Court acts as if it is feasting at a smorgasbord of common law remedies from which it is free to pick and choose the remedies it fancies.  In its common law meanderings, the Court doesn't even recognize that we have a statute of limitations to be honored.

¶101  Section 27-2-207, MCA, imposes a two year statute of limitations for injuries to property, including nuisance and trespass claims.  Section 27-2-102(2), MCA, provides:

"Unless otherwise provided by statute, the period of limitation begins when the claim or cause of action accrues." Section 27-2-102(1)(a), MCA, further provides "a claim or cause of action accrues when all elements of the claim or cause exist or have occurred, the right to maintain an action on the claim or cause is complete, and a court or other agency is authorized to accept jurisdiction of the action."

¶102 The statutory scheme, of course, does not provide a textual exception for continuing nuisance and trespass claims, though it does provide an exception for the discovery rule. *See* § 27-2-102(3), MCA. The Court concedes the statute of limitations for Appellants' claims is not tolled by the discovery rule, but maintains that an extratextual, common-law exception, denominated as the continuing tort doctrine, tolls the statute. While the continuing tort doctrine is well established in the precedent of this Court, the doctrine cannot be applied to supplant the statutory scheme. In Montana "there is no common law in any case where the law is declared by statute." Section 1-1-108, MCA. And where the law is not declared by statute, the common law is applicable only so far as it does "not [] conflict with the statutes" of this State. Section 1-1-108, MCA. Any interpretation adopted by this Court of the continuing tort doctrine must be compatible with the statutory scheme and the Legislature's intent to impose a two year statute of limitations on nuisance and trespass claims.[1]

---

[1] There is authority for the proposition that the common law doctrine of continuing tort and the statutory rule of accrual are incompatible. *See Jensen v. General Elec.* Co., 82 N.Y.2d 77, 84, 623 N.E.2d 547, 549 (N.Y. 1993) (concluding that the legislature intended no continuing tort exception to the statute).

¶103   Key to the continuing tort doctrine is that the complained of injury is (1) recurring and (2) remediable.  66 C.J.S. *Nuisances* § 6 (2009).[2]  Even if the Court is correct in holding that Appellants have introduced sufficient evidence to raise a jury issue about whether the injury is remediable, the Appellants have failed to introduce evidence showing the injury is recurring.  I believe this is to be fatal to their claim.

¶104   The Court devotes a sizeable portion of its opinion to attacking a straw man who, I gather, is pressing the Court to adopt a bright-line rule that migration is in every case the dispositive factor.  Opinion, ¶ 29.  In this regard, I agree with the Court that migration is not dispositive of the continuing tort doctrine in all cases.  Nor is migration, for that matter, dispositive of the continuing tort doctrine in all environmental contamination cases.  However, that is not the issue.  The issue is whether migration is required under the facts of *this* claim.  Here, migration is determinative of the Appellants' claims because the Appellants cannot demonstrate *a recurring injury* without it.  The Appellants have conceded the contamination is stabilized and the only other alleged recurring injury to their property is repeated property invasions stemming from the continued migration of contamination beneath their property and potentially into their groundwater.  Absent migration the Appellants have but merely a single, unbroken, decades-long injury.

---

[2] Justice Baker's concurrence adopts this standard and offers a similar line of reasoning, with which I largely agree.  Concurrence, ¶ 80.  However, while I agree that the recurring prong is based principally on the idea of ascertainment of damages, I disagree with the concurrence's characterization of the injury in terms of stabilization (as it uses the term) and its implicit conclusion that the recurring prong is necessarily a jury question.

¶105 The continuing tort doctrine cannot be harmonized with the statutory scheme without a recurring injury. Fundamental to the doctrine is the principle that "[w]hen a court finds that a continuing nuisance has been committed, it implicitly holds that the defendant is committing a new tort" and thereby has "trigger[ed] a new statute of limitations." *Lyons v. Twp. of Wayne*, 185 N.J. 426, 433 (N.J. 2005); *see also Burley*, ¶ 14 (a new cause of action arises "each time that it repeats"). In this way, by requiring a plaintiff to demonstrate a recurring tort, we preserve the intent of the Legislature to impose a statute of limitations—in effect concluding that the Legislature intended to time-bar old torts, but did not intend to bar the new torts because "all elements of the claim or cause" have not occurred with respect to them. A necessary corollary is that we do not permit a plaintiff to recover damages for all injuries, but only those new injuries that have occurred within the statute of limitations period immediately preceding the filing of the complaint. *Graveley Ranch*, 240 Mont. at 23, 782 P.2d. at 373. However, when there ceases to be new torts the statute of limitations ceases to reset and the nuisance or trespass becomes permanent. 66 C.J.S. *Nuisances* § 6 (2009) ("A nuisance is permanent when there is only one unceasing invasion of the plaintiff's interests, giving rise to only one cause of action, with damages assessed once and for all."). A plaintiff must continue to demonstrate recurring torts to his property in order to continue triggering new statutes of limitations.

¶106 We have consistently required a recurring injury to trigger new causes of action. In *Graveley Ranch*, we concluded that "a new cause of action may arise each time a cow becomes ill or dies as a result of lead poisoning." *Graveley Ranch*, 240 Mont. at 25, 782

P.2d at 375. We reasoned that the mere "fact that the nuisance continues does not make the cause of action a recurring one." *Graveley Ranch*, 240 Mont. at 25, 782 P.2d at 373. We explained that there must be a new injury that with "[e]ach repetition" will "give[] rise to a new cause of action." *Graveley Ranch*, 240 Mont. at 23, 782 P.2d at 373. Thus, we were explicit the recurring injury, the death or sickness of a cow, not the continuation of the nuisance, triggered new statutes of limitations.

¶107   In *Haugen Trust*, we concluded that the recurring trespass there, a recurring flood, gave rise to a new cause of action because *each time* it occurred it caused a *new injury*. *Haugen Trust*, 204 Mont. at 511, 665 P.2d at 1134. We explained, because the damage occurring from the floods varied "from occurrence to occurrence" depending on "each flood," the "damage is not *yet* permanent" and "gives rise to a separate cause of action *each time* it causes damages." *Haugen Trust*, 204 Mont. at 513-14, 665 P.2d at 1135 (emphasis added). Again, we required a recurring injury to the plaintiff's property, another flood, to trigger a new cause of action.

¶108   In *Blasdel*, we again concluded that a flood, this time a flood stemming from a river backed up by a dam, tolled the statute of limitations until it ceased creating a recurring injury. *Blasdel*, 196 Mont. at 425, 640 P.2d at 894. We focused on the "intermittent" nature of the flooding and the recurring invasions of the plaintiffs' property interest, explaining that the "source of the entire claim—the overflow due to rises in the level of the river—is not a single event." *Blasdel*, 196 Mont. at 425, 640 P.2d at 894. Although the water continued to remain on the plaintiffs' property after 1960, this was not enough to toll the statute of limitations. *Blasdel*, 196 Mont. at 426, 640 P.2d at 894.

We held instead that, while plaintiffs' claims were tolled for a number of years, their claims accrued in 1960 when there ceased being new property invasions. *Blasdel*, 196 Mont. at 426, 640 P.2d at 894.

¶109 In *Montana Pole*, the Ninth Circuit, interpreting Montana law under a unique set of facts, held that contamination remaining on the plaintiff's property did not produce a recurring cause of action. *Mont. Pole*, 993 F.2d at 680. Montana Pole operated a wood treatment plan and used penta, a chemical preservative, which contaminated Montana Pole's property. Montana Pole brought suit against the manufacturers of the penta for the chemical contamination of its property, arguing the continuing tort doctrine tolled the statute of limitations because the contamination remained on the property. *Mont. Pole*, 993 F.2d at 677. The Ninth Circuit disagreed, noting that Montana recognizes a continuing tort claim only where the injury is "recurring and abatable," and the theory is that each new injury "gives rise to a separate cause of action." *Mont. Pole*, 993 F.2d at 679. The court explained that the "argument that the injury continued into the statutory period because the penta contamination remained on the property is simply unpersuasive." *Mont. Pole*, 993 F.2d at 680. Rather, the court, quoting *Graveley*, concluded that "'the fact that the nuisance continues does not make the cause of action a recurring one.'" *Mont. Pole*, 993 F.2d at 680 (quoting *Graveley Ranch*, 782 P.2d at 373, 240 Mont. at 23).

¶110 Finally, in our seminal case, *Burley v. BNSF*, we held that contamination that "continues to migrate, will toll the statute of limitations until the harm no longer

67

reasonably can be abated."[3] *Burley*, ¶ 99. After writing several pages of analysis to determine whether migration would be relevant to our decision, considering our precedent, and the policies behind the doctrine we concluded the "fact that a nuisance continues to migrate constitutes an important factor under Montana law in evaluating whether the pollution should be treated as continuing trespass or nuisance." *Burley*, ¶ 73. We explained that the continuing tort doctrine applies only if there is an "injury that gives rise to a new cause of action *each time* that it *repeats*." *Burley*, ¶ 14 (emphasis added). We explained that migration provides a recurring cause of action because of the recurring property injury: "Each entry of pollution onto a party's property caused by its migration constitutes a new cause of action." *Burley*, ¶ 68. Specifically, we reasoned that the migrating pollution at issue continued to advance onto the plaintiff's property constituting a new "property invasion," which "fits Montana's historical definition of a continuing temporary injury." *Burley*, ¶ 73. Therefore, we were explicit in detailing the unique injury migration provides, and once again, in accordance with precedent, required a recurring injury to trigger new causes of action.

¶111 Nonetheless, the Court today draws a completely different conclusion from *Burley*. While the Court does not dispute that migration was an "important factor" to our decision, it attributes migration's significance to the potential to affect abatement of the

_____

[3] It should come as no surprise that the plaintiffs in *Burley*, well aware of our case law, argued that the contamination produced a recurring injury. The plaintiffs reasoned "the new contamination will continuously arrive and cause new injury to plaintiff's property," and "key to answering the certified question rests on the fact BNSF's contamination is still migrating." Brief for Appellant at 1, 14, *Burley v. Burlington N. & Santa Fe Ry. Co.*, http://courts.mt.gov/library (June 8, 2011) (No. 11-0021).

injury. Opinion, ¶ 33. The Court's reading is impermissible for a number of reasons. First, nowhere in our lengthy analysis in *Burley* did we state that migration was an "important factor" because it affected remediation of the contamination. However, we did explicitly state the factors necessary to discern whether the contamination was reasonably abatable:

> Courts should evaluate whether it would be reasonable for the tortfeasor to abate the harm taking into account all factors, including the ease with which the harm could be abated. Other factors include the cost of the abatement, the type of property affected, the severity of contamination, and the length of time necessary to remediate such pollution.

*Burley*, ¶ 89. *Migration is not among the factors*. Second, in the twenty-four paragraphs we used in *Burley* to attempt to track the contours of the reasonable abatement standard there is little mention of the "important factor" of migration—using the word "migration," in all, a single time. Third, in no other case have we ever explained that migration affects abatement. In *Burley*, we relied on our decisions in *Walton*, *Blasdel*, *Haugen Trust*, *Nelson*, and *Graveley Ranch* to conclude that migration was an important factor to our analysis. *Burley*, ¶ 71. There is nothing in these cases to suggest that migration impacts abatement, and it would likely have been inappropriate for the Court to make that conclusion, without citing expert testimony in any of those cases and lacking the technical expertise itself.

¶112 Lastly, the Court's reasoning is inherently self-defeating. The Court completely ignores the elephant in the room: in *Burley*, migration was an important factor serving to *establish* a continuing tort, but under the Court's abatement standard migration serves only to *prevent* a continuing tort.

¶113 In *Burley* we explained, in so many words and in so many different ways, that migration was a factor supporting the plaintiff's position that the contamination *constituted* a continuing tort. *Burley*, ¶ 68 ("consider[ing] migrating property contamination to *constitute* a continuing temporary tort.") (emphasis added); *Burley*, ¶ 73 ("The reasoning and outcomes of these Montana cases leads us to conclude, as further explained below, that a nuisance of a continuing temporary nature *includes* migrating pollution.") (emphasis added); *Burley*, ¶ 73 ("The migrating pollution in the instant case, though stabilized in terms of concentration levels, *fits* Montana's historical definition of a continuing temporary injury.") (emphasis added); *Burley*, ¶ 73 ("A defendant's failure to stop the continuing migration of a nuisance onto a plaintiff's property, where it reasonably can be stopped, *constitutes* a continuing property invasion.") (emphasis added); *Burley,* ¶ 68 ("Each entry of pollution onto a party's property caused by its migration *constitutes* a new cause of action.") (emphasis added); *Burley*, ¶ 73 ("To classify as permanent a nuisance that continues to migrate could bar a plaintiff from bringing a nuisance action, even if the contamination from a defendant's tortious actions continues to affect different parts of her land each day.").

¶114 However, the Court rewrites *Burley* to effectuate a complete turnabout with respect to migration. Under the reasonable abatement standard, migration's only relevance is to show that abatement will be difficult, Opinion, ¶ 35, meaning migration is a factor wholly supporting ARCO's position that the contamination *does not constitute a continuing tort*.

¶115 There is simply no two ways about it. Migration played an entirely different role in *Burley* than it plays in the Court's opinion. In *Burley* migration was a factor counseling in favor of tolling the statute of limitations, but now the Court places migration entirely on the other side of the ledger. The Court doesn't even bother to address its error in logic or the obvious contradiction this creates in our jurisprudence. Any sensible reading of *Burley* leads to the conclusion that migration has legal import outside of abatement.

¶116 In sum, the Court's interpretation of *Burley* lacks both merit and logic. Migration provides a recurring injury. And, in turn, a recurring cause of action. *Burley*, ¶ 68 ("Each entry of pollution onto a party's property caused by its migration constitutes a new cause of action."). This is why it is an "important factor." The Court's nonsensical reasoning will ultimately come at the confusion of future parties.[4] If the Court wishes to overrule *Burley* it should expressly do so. The citizens and practitioners in Montana deserve to know the rule of law.

¶117 Next, the Court relies on *Shors*, which we decided two decades prior to *Burley* and a year prior to the Legislature's passage of § 27-2-102(1)(a), (b), MCA. In *Shors*, a developer, Branch, subdivided property and granted the lot owners of the subdivided property access to the Middle Fork of the Flathead River via a Declaration of Restrictions

---

[4] For instance, it is the Appellants that maintain there is evidence of migration, and it is ARCO who steadfastly denies that the contamination is migrating. If migration's importance lies with abatement, the parties are arguing against their own interests: ARCO should be arguing that there is migration, and the Appellants should be arguing that there is not migration. Yet, by upholding *Burley*, which stands for the proposition that migrating pollution makes it *easier* for a plaintiff to demonstrate a continuing tort, the Court complicates matters beyond comprehension.

contained within the parties' contracts. In 1976, Branch placed a locked gate across the road in violation of the Declaration of Restrictions. Several of the lot owners, including Shors, filed an action against Branch in 1982 for interference with their access to the river. *Shors*, 221 Mont. at 396, 720 P.2d at 243. The district court concluded that Branch had "unlawfully and unreasonably restricted Plaintiffs' right of access, in derogation of the Declaration of Restrictions . . . ." *Shors*, 221 Mont. at 397, 720 P.2d at 243. On appeal, we addressed whether the plaintiffs' claim for damages for interference with their access to the river was barred by the statute of limitations. *Shors*, 221 Mont. at 394, 720 P.2d at 241. We answered in the negative. We first reasoned the plaintiffs were entitled to damages and their claim was not time-barred because it "sound[ed] in contract, with an 8 year statute of limitation under Section 27-2-202, MCA." *Shors*, 221 Mont. at 397, 720 P.2d at 243. After concluding the statute of limitations did not bar their claim, we further provided an additional rationale, reasoning that the continuing tort doctrine also tolled the statute of limitations for injuries to property. In a single sentence of analysis, we concluded "that blockage of plaintiffs' access to the river by the gate was a continuing tort, [sic] because it was easily abated." *Shors*, 221 Mont. at 397, 720 P.2d at 243-44.

¶118 Even if the limited analysis in *Shors*, although questionable, is susceptible to the Court's interpretation that abatement is the sole inquiry under the continuing tort doctrine, I would not permit *Shors* to control here. First, the continuing tort analysis in *Shors* was unneeded. We had already concluded that the plaintiffs' claim was not barred by the statute of limitations prior to our analysis concerning the continuing tort doctrine. Second, *Shors* is inconsistent with prior decisions, including among others *Burley* and

72

*Blasdel*. As explained above, we have consistently required a recurring injury. Notwithstanding the Court's poor attempt to mischaracterize *Burley*, we confirmed in *Burley* that a plaintiff must demonstrate a recurring injury—*Shors* stands in direct conflict with *Burley*. Likewise, the Court's approach renders *Blasdel* no longer good law. Although the Court explains that "*Blasdel* was an inverse condemnation case," Opinion, ¶ 30, the principles announced in *Blasdel* are engrained in this Court's case law, and it has been cited as much, if not more than, any other case.[5, 6] *Burley*, ¶ 21. Third, while we did not find it relevant to the continuing tort doctrine analysis in *Shors*, there was seemingly a recurring injury there. We noted expressly that the "gate was left open" at times. *Shors*, 221 Mont. at 398, 720 P.2d at 244. Lastly, *Shors* was decided a year prior to the Legislature's passage of § 27-2-102(1), (2), MCA.[7] Sec. 1, Ch. 441, L. 1987. Thus, because the accrual time was decided entirely under common law, we did not have to contend with the will of the Legislature as we must do today.

---

[5] We have favorably cited *Blasdel* in our decisions in *Haugen Trust*, *Graveley*, *Burley*, and *E.W. v. D.C.H.*

[6] In regard to *Blasdel*, the Court also explains, "More importantly, however, our inquiry in *Blasdel* concerned the nature of the injury to the property owners, recognizing that the 'source of the entire claim' was the 'overflow due to rises in the river,' which was identified as a continuing event." Opinion, ¶ 30. The point the Court is attempting to make with this statement is beyond my comprehension. In *Blasdel*, the water remaining on the property was not enough to toll the statute of limitations—new causes of action ended with the cessation of new injuries. Under the Court's reasoning, contamination remaining on the property may forever toll the statute of limitations. This is inconsistent with the holding in *Blasdel*. Consequently, *Blasdel* is no longer good law.

[7] Section 27-2-102, MCA, went through extensive revisions in 1987, including providing a start date for statutes of limitations and the codification of the discovery doctrine.

¶119 The Court departs from previous decisions and follows *Shors* based principally on the idea of certainty. Opinion, ¶ 32. The Court forcefully "decline[s] to leave the operation of the law to chance," reasoning that migration cannot be determinative because if so "continued liability would be determined by factors not within the control of the parties, such as *soil characteristics* or the *flow of groundwater*." Opinion, ¶ 32 (emphasis added). Rather, the Court concludes the sole inquiry must be abatement because, as the Court explains, then continued liability will depend instead on factors within the control of the parties, such as "soil" characteristics and the flow of "shallow groundwater." Opinion, ¶ 38. The Court's reasoning is unfortunately no better with regard to policy than it is with the law. Because we decided in *Burley* to focus on the injury rather than conduct to establish new causes of action, continued liability will always depend on factors not within the control of the parties.[8,9]

¶120 However, the continuing tort doctrine is not without a policy justification. The continuing tort doctrine attempts to act as counterweight against the defendant's interest in certainty provided for in a statute of limitations by protecting the plaintiff's interest in remedying his injury when damages are largely uncertain. *Burley*, ¶ 41 ("We discern one

---

[8] There are several states that utilize a conduct-based approach. In those states, the statute of limitations would have begun to run in this instance in 1980 when the smelter closed and the defendant's conduct ended. *See Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 254 (La. 2010).

[9] The states that utilize an injury-based approach as we do and have considered both migrating contamination and non-migrating contamination have concluded that migration is necessary to continue tolling the statute of limitations. *Compare Carpenter v. Texaco, Inc.*, 646 N.E.2d 398, 399-400 (Mass. 1995) *with Taygeta Corp. v. Varian Assocs.*, 763 N.E.2d 1053, 1064-65 (Mass. 2002) and *compare Modern Tractor & Supply Co. v. Leo Journagan Constr. Co.*, 863 S.W.2d 949, 951 (Mo. Ct. App. 1993) *with Cook v. De Soto Fuels, Inc.*, 169 S.W.3d 94, 105 (Mo. Ct. App. 2005).

consistent theme in reviewing the historic decisions of this Court that evaluate whether a nuisance should be classified as temporary or permanent: whether the injury is sufficiently complete to ascertain permanent damages."). In fact, we have often differentiated between permanent torts and temporary torts based upon whether the damages were ascertainable, with the tort becoming permanent when the damages became certain. *Burk Ranches v. State*, 242 Mont. 300, 306, 790 P.2d 443, 447 n.2 (1990) ("'permanent injury' refers to whether the injury has stabilized enough that the extent of the damage has become reasonably certain."); *Graveley Ranch*, 240 Mont. at 24-25, 782 P.2d at 371 ("a permanent nuisance is one where the situation has 'stabilized' and the permanent damage is 'reasonably certain.'"); *Haugen Trust*, 204 Mont. at 513, 665 P.2d at 1135 ("A permanent injury is one where the situation has 'stabilized' and the permanent damage is 'reasonably certain.'"). Because new injuries give rise to additional damages—whether it be another flood (*Haugen Trust*, *Walton*, and *Blasdel*), additional glue waste (*Nelson*), increased traffic, noise, and dust (*Knight*), or migrating pollution (*Burley*)—a plaintiff's damages are necessarily more difficult to ascertain when there is a recurring injury. Recurring injuries produce new and uncertain damages. But when there is no recurring injury, there is no uncertainty. As illustrated here, the Appellants' damages were just as ascertainable on April 17, 2006 as they were in the years preceding. The rationale underpinning the continuing tort doctrine provides no justification for continuing to toll the statute of limitations where, as here, the damages were ascertainable long ago.

¶121   In contrast, the policy underpinning the other side of the scale supports the accrual of the cause of action prior to April 17, 2006.  "Statutes of limitation serve an important purpose."  *E.W. v. D.C.H.*, 231 Mont. 481, 486, 754 P.2d 817, 820.  They exist to suppress stale and untimely claims even if otherwise viable and sympathetic.  *E.W.*, 231 Mont. at 486, 754 P.2d at 820.  By penalizing delay, they compel litigants to bring their claims "within a reasonable time to enable the opposing party to mount an effective defense."  *Mont. Pole*, 993 F.2d at 678.  And they are of no less importance in the context of environmental contamination where the earlier pollution is remediated the better it is for the parties and the public.

¶122   Although the Court acknowledges these purposes, it does not elaborate on how they will be promoted by its decision, offering only that the abatement standard will "promot[e] finality."  Opinion, ¶ 33.  Of course, the Court's decision will not advance the purposes of statutes of limitations any more than the abatement standard promotes finality.  Creating perpetual tort liability does compel litigants to bring their claims in a reasonable time, it does not safeguard an opposing party's ability to mount an effective defense, and it does not encourage early remediation of environmental contamination. What it does is to ensure that a claim will be brought when it is expedient for the litigant pursuing damages, in disregard to the interests of the opposing party and the public.  For those who are alleged to have pounded a post in the wrong pasture, poured a driveway past the property line, or dug a ditch for a gas line outside an easement, the Court's decision guarantees they must be prepared to mount a legal defense for all time.  As for finality, and the cleanup of environmental contamination, that will come at a time of the

claimants own choosing, possibly decades after damages have become ascertainable, provided he can overcome the sole impediment that is the Court's flimsy reasonable abatement standard: (1) "can be reduced" Opinion, ¶ 37; (2) "by some means." Opinion, ¶ 45.

¶123 In short, I cannot agree that the Legislature, by providing "[w]ithin 2 years is the period prescribed for the commencement of an action for injury to or waste or trespass on real or personal property" intended to impose a 2 year statute of limitations on only those injuries that are incapable of abatement. Nor can I agree that the Legislature by writing "[u]nless otherwise provided by statute, the period of limitation begins" when "all elements of the claim or cause exist or have occurred" intended the statute of limitations for nuisance and trespass claims to be tolled for as long as the claimant sees fit. The Court did not create the continuing tort doctrine today. But, in a decision that is wanting on text, precedent, policy, and much too often sound reasoning, the Court did expand the doctrine at the expense of power that is properly reserved for the Montana Legislature.

¶124 Given that my primary dispute with the Court is its holding under Issue 1, and the lengthy discussion necessitated thereby, I will not address the remaining issues. I believe that the record does not support the existence of migration necessary to establish a recurring injury. I agree with the District Court's reasoning under the discovery rule, and thus concur with the Court's resolution of Issue 4.

/S/ JIM RICE